**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| GARRETT ROLFE | * | |
| | * | |
| Plaintiff, | * | |
| | * | No.: 1:22-cv-02339-MHC |
| v. | * | |
| | * | |
| KEISHA LANCE BOTTOMS, in her | * | JURY TRIAL DEMANDED |
| Individual and Official Capacities | * | |
| as Mayor of the City of Atlanta, Georgia | * | |
| PAUL HOWARD, in his | * | |
| Individual and Official Capacities, | * | |
| and ERIKA SHIELDS, | * | |
| in her Individual and | * | |
| Official Capacities | * | |
| CLINT RUCKER, in his Individual | * | |
| and Official Capacities | * | |
| DONALD HANNAH II, in his Individual | * | |
| and Official Capacities | * | |
| THE CITY OF ATLANTA, GEORGIA, | * | |
| FULTON COUNTY GEORGIA | * | |
| | * | |
| Defendants. | * | |

## [PROPOSED] FIRST AMENDED COMPLAINT

COMES NOW Plaintiff, GARRETT ROLFE, by and through his attorneys,

Lance LoRusso and Ken Davis, and files his First Amended Complaint pursuant to

the Federal Rules of Civil Procedure Rule 15(a)(2). Plaintiff brings this First

Amended Complaint under 42 U.S.C. § 1983 and for various state law torts, and states the following in support thereof:

## **INTRODUCTION**

This is a civil action under 42 U.S.C § 1983 seeking damages against Defendants for committing acts, under color of law, with the intent to and for the purpose of depriving Plaintiff of the rights secured under the Constitution and laws of the United States. Plaintiff also asserts state law claims against Defendants Paul Howard, Keisha Lance Bottoms, Erika Shields, Donald Hannah, and Clint Rucker. Plaintiff seeks equitable relief, compensatory damages, attorneys' fees, and costs for Defendants' unlawful actions. Plaintiff also seeks punitive damages against all natural defendants sued in their individual capacities.

## **JURISDICTION AND VENUE**

1. Plaintiff's claims brought under 42 U.S.C. § 1983 present federal questions over which this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and § 1343(a). This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C § 1367.

2. This Court is a proper venue for Plaintiff's claims, under 28 U.S.C. § 1391(b) because the acts complained of herein occurred in this District.

3. Plaintiff properly and timely placed Defendant City on notice of his claims as required by O.C.G.A. § 36-33-5 by mailing notices overnight delivery certified, to the parties. Plaintiff properly and timely placed Defendant County on notice, in substantial compliance with the Official Code of Georgia, as required by O.C.G.A. § 36-11-1, by mailing notices overnight delivery certified.

4. Plaintiff has placed applicable Defendants on notice of his claims in substantial compliance with the Official Code of Georgia and complied with conditions to file this suit including any and all notice and exhaustion requirements.

## THE PARTIES

5. Plaintiff resides in the Northern District of Georgia, is subject to the jurisdiction of this court, at all times relevant, was a Police Officer with the Atlanta City Police Department ("APD"), and a certified peace officer in the State of Georgia. Further, Plaintiff was a certified Drug Recognition Expert and assigned by the APD to a specialized unit to detect and arrest drivers who were operating vehicles under the influence of drugs and alcohol.

6. Defendant Keisha Lance Bottoms was, at all times relevant, the Mayor for the City of Atlanta, Georgia and a resident of Fulton County, Georgia residing at 4900 Guilford Forest Drive SW, Atlanta, GA 30331, in the Northern District of

Georgia. Once served with process, she is subject to the jurisdiction of this Court. Defendant Bottoms is sued in her personal and official capacities.

7. Defendant Bottoms, as a member of the Georgia Bar, former judge, and as a past-member of the Atlanta City Council, was familiar with the policies, procedures, customs, practices and duly passed ordinances of the City of Atlanta.

8. Defendant Erika Shields was, at all times relevant, the Police Chief for the APD. She was, at the time relevant, a resident of Cobb County, Georgia, within the Northern District of Georgia, and is currently a resident of Louisville, Jefferson County, Kentucky. Plaintiffs are not providing her home address as a courtesy: Defendant Shields is the Chief of Police of the Louisville Police Department. Defendant Shields is sued in her personal and official capacities.

9. Defendant Shields, once served with process, is subject to the jurisdiction of this Court; she regularly engages in transactions relating to her former employment with the APD. Therefore, the Northern District of Georgia is a convenient forum in which to appear. Defendant Shields maintains sufficient voluntary contacts with the District to satisfy any minimum contacts analysis necessary to exercise personal jurisdiction over her regarding this matter.

10. Defendant Paul Howard was, at all times relevant, the District Attorney for the Atlanta Judicial Circuit and a resident of Fulton County, Georgia residing at 920

Dannon View SW, Suite 3202, Atlanta, GA 30331, in the Northern District of
Georgia. Once served with process, he is subject to the jurisdiction of this Court.
He is sued in his personal and official capacities.

11. Clint Rucker is a natural person, who on information and belief resides in the
District and is a citizen of Georgia. Mr. Rucker is a former Fulton County
Assistant District Attorney, who is being sued in his individual and official
capacities. At all times relevant, Mr. Rucker was an employee of Fulton County.

12. Donald Hannah is a natural person, who on information and belief resides in the
District and is a citizen of the State of Georgia. Donald Hannah is a former
Criminal Investigator with the Office of Fulton County District Attorney, who is
being sued in his individual and official capacities.

13. Defendant Hannah was at all times relevant to this action a peace officer duly
certified in the State of Georgia and was an employee of Fulton County, Georgia.

14. At no time was Defendant Hannah, Howard, or Rucker acting in a prosecutorial
capacity: each of them acted as first-instance investigators attempting to establish
probable cause for arrest; this is a duty traditionally undertaken by police officers
and in no manner prosecutorial. None of the statements made by Howard was in
furtherance of a criminal prosecution. Further, no criminal indictment was ever
presented to a grand jury and ultimately the criminal case brought against Plaintiff

was terminated in his favor: "Under the facts and circumstances confronting Officer Rolfe, *the use of deadly force was objectively reasonable and he did not act with criminal intent.*" Administrative Dismissal, Fulton County Superior Court case no. 20CP192494 (emphasis added).

15. Defendant Fulton County, Georgia ("County") is a political subdivision of the State of Georgia which may be sued in its own name pursuant to O.C.G.A. § 36-1-3 and may be served with process by serving Commission Chairman Rob Pitts at 141 Pryor Street SW 10th Floor Atlanta, GA 30303. Once served with process, County is subject to the jurisdiction of this Court. County has waived sovereign immunity to the extent of its purchase of liability insurance.

16. Fulton County has the ability under state law to provide employees to the Fulton County District Attorney's Office or to otherwise provide staffing to that Office in multiple manners. On information and belief, these Fulton County employees are placed at the discretion of the then-current Fulton County District Attorneys, but nonetheless remain Fulton County employees, paid entirely or partially by Fulton County, subject to county training and grievance procedures, subject to Fulton County Human Resources policies and personnel, participate in the Fulton County retirement system, may be hired directly through postings made by Fulton County, and ultimately are under the control of the County.

17. On information and belief, Defendants Rucker and Hannah were such Fulton County employees, placed under the supervision of Defendant Howard. In this position the County had placed Defendant Howard with policymaking authority of the County over those County employees.

18. Defendant Howard, acted as the final decision and policymaker for County employees of the Office of Fulton County District Attorney. In such a capacity, Defendant Howard set policies by which County employees acted in an investigatory capacity conducting first-instance probable cause investigations.

19. Neither in his capacity as a State officer, nor in his capacity as a prosecutor did Howard have any duty to undertake first-instance probable cause investigations.

20. The City of Atlanta, Georgia ("City" or "City of Atlanta") is a municipality organized pursuant to the laws of the State of Georgia and may be served with process by serving Mayor Andre Dickens at 55 Trinity Street SW, Atlanta, GA 30303. Once served with process, City is subject to the jurisdiction of this Court.

21. Defendant Bottoms, in her capacity as Mayor, acted as the final decision and policymaker for the City of Atlanta in making statements to the press and public.

22. Every individually named Defendant was at all relevant times acting under color of law unless otherwise directly stated.

23. Each individually named Defendant was at all relevant times acting maliciously, knowingly violating Plaintiff's clearly established rights or acting with reckless disregard to Plaintiff's clearly established constitutional rights.

24. Officer Devin Brosnan ("Officer Brosnan"), not a party to this suit, first responded and assisted Officer Rolfe. Officer Brosnan, at all relevant times, was a duly sworn peace officer employed by the APD.

25. Plaintiff and Officer Brosnan acted in accordance with relevant APD use-of-force regulation. Such would have been clear to any reasonable investigator or observer; it was equally clear that Plaintiff violated no APD policy or law.

26. All use of force, described herein, was in conformance with training, Georgia and federal law, prevailing standards of law enforcement, and the policies and procedures of the APD and City. All force utilized by Plaintiff was proportional to the circumstances, reasonable, and necessary.

27. No reasonable person would have viewed the force as excessive.

## **<u>FACTS</u>**

28. On June 12, 2020, Officer Brosnan was dispatched to a Wendy's restaurant located at 125 University Avenue SW, in response to a suspect, later identified as Rayshard Brooks, who was reported unconscious in the drive-through.

29. The 911 caller, a Wendy's employee who indicated her name as Joyce, stated that she believed the suspect, driving a vehicle, was intoxicated.

30.  Officer Brosnan responded to the scene and made contact with Brooks.

31.  Upon concluding that Brooks was under the influence of alcohol, or other substances, Officer Brosnan requested Plaintiff's assistance.

32. After thorough investigation, Brooks was determined to be impaired—under the influence of alcohol—and operating a vehicle a violation of section 40-6-391.[1]

33. Plaintiff and Officer Brosnan were polite to Brooks throughout the entire encounter; Brooks was compliant until Plaintiff placed Brooks under arrest.

34. Without warning or provocation, Brooks chose to violently attack Plaintiff and Officer Brosnan, who were in uniform, conducting a lawful arrest.

35. Brooks rapidly escalated his unlawful resistance by punching Plaintiff in the face and attacking Officer Brosnan—first with his fists, and then, after forcibly stealing Officer Brosnan's TASER, firing the TASER at Officer Brosnan's face.

36. Brooks, lawfully under arrest, and now armed, began running through the crowded parking lot committing a felony under Georgia law.

---

[1] All citations to statutes unless otherwise noted are to the Official Code of Georgia.

37. In an effort to place Brooks in custody and stop his assault, Plaintiff lawfully deployed his APD-issued TASER twice, but it had no effect on Brooks.

38. Instead of merely trying to escape from the officers' lawful custody, Brooks reached back with his arm extended and pointed an object at Plaintiff.

39. Plaintiff heard a sound like a gunshot and observed a flash; fearing for his safety and the safety of those around him Plaintiff fired his service firearm at Brooks.

40. Plaintiff and Officer Brosnan immediately called EMS; Plaintiff retrieved his personal first aid supplies from his vehicle and used them to render aid to Brooks.

41. When Brooks' pulse stopped, Plaintiff immediately began CPR and continued until EMS relieved him.

42. Plaintiff and Officer Brosnan were authorized to use force, including deadly force, to apprehend and arrest Brooks for his commission of crimes involving the infliction or threatened infliction of serious physical harm and to end his immediate threat of physical harm to them or others and to prevent his commission of forcible felonies per § 17-4-20.

43. At the time of the shooting, Brooks was endeavoring to escape with a stolen weapon, a "firearm" per §§ 16-10-33(a) & 16-11-106(a), and was lawfully under arrest, having committed multiple crimes in the presence and immediate

knowledge of Plaintiff and Officer Brosnan. It was also later determined that Brooks was a convicted felon and member of a violent criminal street gang.

44. For Brooks, a convicted felon, very possession of a TASER was itself unlawful.

45. All force used was within the performance of Plaintiff's and Officer Brosnan's duties as APD officers and consistent with training of the APD. Their use force was well within the practices, policies, procedures and customs of the APD, including APD work rule and Standard Operating Procedure; further, the conduct clearly complied with the law of the United States and Georgia.

46. Less than 24 hours after the incident, Plaintiff was contacted by an attorney with the International Brotherhood of Police Officers whom the City informed of its intent to terminate Plaintiff's employment.  This was the only notification that Plaintiff received of his termination.  No official notification was made directly, either via in-hand delivery or certified mail as is required by City Ordinance.

47. On the same day, again less than 24 hours after the incident, Ken Allen, National Association of Government Employees Vice President, received copies of the City's "Notice of Proposed Adverse Action" (NPAA) form and the city's "Notice of Final Adverse Action" (NFAA) form at the same time.

48. City ordinances, policies, procedures, practices, and customs require the NPAA be received prior to dismissal and that the employee be given time to review files and prepare for a mandatory Employee Response Session (the "MERS").

49. Neither Defendant Chief Shields nor any member of her staff or designee was present when Ken Allen received copies of the NPAA and NFAA.

50. Both forms are dated June 13, 2020, have the printed name "Chief E. Shields," and bear a signature believed to be that of Assistant Chief Todd Coyt.

51. Both forms bear a witness signature which is undecipherable but believed to be that of Ken Allen. The witness signatures, however, are dated June 11, 2020.

52. Both forms further note, "Employee did not attend" the MERS.

53. NPAA form has a pre-printed block addressed to the employee, explaining an employee's right to either provide a written response or appear before the disciplinary authority, with blank spaces for dates and times. Handwritten on the form is an indication that a response was due the day issued, on June 13 at 4:45.

54. Again, Plaintiff never received either of these notifications, and even if he had, such notice was improper under City Ordinance and grossly inadequate.

55. Plaintiff was never provided adequate notice or opportunity to respond to the disciplinary charges as required by City Ordinance and APD policy.

56. Additionally, contrary to the clear policies, procedures, customs, and practices of the City, the Office of Professional Standards did not, or was not permitted to, conduct an investigation prior to Plaintiff's termination.

57. While the NFAA forms produced by the City of Atlanta bear the name of Defendant Shields, Defendant Bottoms, published her improper and unlawful decision to terminate Plaintiff; Bottoms was not authorized to terminate Plaintiff.

58. Having achieved the status of a "non-probationary employee" and employee in the "classified service," pursuant to City of Atlanta Municipal Code, Plaintiff had a legally protected property right in his employment and could only be terminated or disciplined for cause after a mandatory disciplinary process.

59. Plaintiff was terminated summarily without notice or opportunity to respond, after an inadequate investigation conducted personally by Bottoms.

60. Defendants Howard and Bottoms almost immediately scheduled media appearances to publicly condemn Plaintiff and Officer Brosnan. On information and belief, this was done to maximize perceived political and reputational benefit.

61. Howard and Bottoms publicly broadcast defamatory statements, absent benefit of any meaningful investigation, which encouraged and incited a violent mob.

62. The statements of Defendants Howard and Bottoms focused the rage and violence of this mob on Plaintiff and Officer Brosnan: by widely publishing the

culpability—legal and moral—of Plaintiff and Officer Brosnan, naming both, and condemning both absent investigation, Defendants Howard and Bottoms placed an imprimatur of state legitimacy on the acts of the ever-growing riotous masses.

63. Almost immediately after the incident, Defendant Howard inserted the District Attorney's Office into a non-prosecutorial role, taking on a first-instance, probable cause investigation. This "investigation" was focused on securing the arrests of Plaintiff and Officer Brosnan for Defendant Howard's political benefit. It was woefully inadequate and indifferent to any facts which were exculpatory.

64. Defendant Howard was aware that the GBI, as part of its investigation into the death of Rayshard Brooks, which began the night of the shooting, would present a full investigative file to him within ninety (90) days.

65. While the GBI investigation continued, Howard's parallel "investigation" to effect the arrest of Plaintiff and establish probable cause rushed ahead.

66. Within five days, after only watching video recordings of the incident, which clearly demonstrate Plaintiff committed no crime, Defendant Howard instructed Defendant Hannah to obtain an arrest warrant for Plaintiff on June 17, 2020.

67. Defendant Hannah in obtaining the warrant omitted readily available exculpatory evidence from this affidavit and included false inculpatory statements, which vitiated probable cause.

68. On information and belief, Defendant Howard, Hannah, and Rucker, were motivated almost entirely by a perceived political benefit for Howard: Howard was in the midst of a contested re-election campaign for District Attorney and would make his prosecution of Plaintiff and Officer Brosnan a campaign point.

69. Minutes after the issuance of the warrant, Defendant Howard began a press conference, carried live on CNN and picked up by other national and international outlets, and invited Brooks' family members, witnesses, and their counsel to speak. This group included witnesses Defendant Howard knew would be interviewed by the GBI as part of its investigation.

70. The press conference was set to begin at 3:00 p.m. and a large contingent of press was assembled at that time. Defendant Hannah applied for the warrants less than 15 minutes before the start of the conference. Howard, Hannah, and Rucker were working in concert to closely coordinate their actions for Howard's benefit.

71. Those assembled at the press conference were likely in the building and waiting for the press conference to start before Judge Rieder even signed the warrants.

72. Defendant Howard made clear he was the driving force behind the warrant being issued preindictment, absent normal investigation; the associated "speedy investigation" and charges were part of his campaign platform and promoted in concert with other proposed criminal "reforms." Defendant Howard went so far

as to petition the Georgia legislature, to change the law to allow district attorneys
to bring charges against law enforcement officers without convening a grand jury.

73. Defendant Howard continued to assiduously spread falsehoods to convince
voters and potential jurors of both Plaintiff's guilt and Defendant Howard's
competence as a District Attorney—all in violation of his ethical duties as an
attorney and as the District Attorney—tainting any potential jurors.

74. Howard ultimately lost the election, his "investigation" was condemned, and
Plaintiff, Officer Brosnan, and a multitude of other officers, would be
exonerated—ultimately, Howard caused the arrest of close to ten APD officers
over the course of weeks for political benefit; after appointments of special
prosecutors, these cases were dismissed without presentment to grand juries.

75. APD Police Chief Bryant stated to WSB he believed the charges were brought
too quickly against Plaintiff and that Defendant Howard's process was flawed.

76. Fani Willis, Defendant Howard's successor, sought to recuse herself and her
office from the prosecution of Plaintiff; on June 4, 2021, an order was issued
disqualifying Ms. Willis and her office from Plaintiff and Officer Brosnan's case.

77. Ms. Willis compared the case against Plaintiff to a "Ringling Brothers' show":

> We can't even [disagree] anymore if this was political . . . Paul
> Howard's ads that he has running on television, he has images from an
> open and active case. The Brooks case. That is unethical to do. It is a
> violation of Georgia bar rules.

78. The Georgia Attorney General appointed Peter Skandalakis, Executive Director of the Prosecuting Attorneys Council of Georgia. After conducting an actual investigation, Mr. Skandalakis announced the dismissal of the case against Plaintiff without presentment to a grand jury, noting that Plaintiff "…acted in accordance with O.C.G.A. § 17-4-20(b); Atlanta Police Department Policy 4.2 Use of Deadly Force (CALEA 6thed. Standard 4.2.1); *Tennessee v. Garner*, 471 U.S. 1 (1985); and *Graham v. Connor*, 490 U.S. 386 (1989). *Under the facts and circumstances confronting Officer Rolfe, the use of deadly force was objectively reasonable and he did not act with criminal intent.*" Administrative Dismissal, Fulton County Superior Court case no. 20CP192494 (emphasis added).

79. Plaintiff appealed his termination and The Civil Service Board reversed Plaintiff's dismissal "[d]ue to the City's failure to comply with several provisions of the Code and the information received during witnesses' testimony, the Board concludes the Appellant was not afforded his right to due process."

80. Assistant Chief Coyt, at the appeal, stated he would have acted in like manner:

> No [I would not have acted differently], because I believe the officers acted accordingly. The officers were trying to show compassion and they were not overly aggressive. They tried to do everything they could to calm the situation down, so I don't think it's anything other than that that I would have done initially when it started [walked Brooks closer to the police vehicle].

81. This was echoed by Internal Affairs Sergeant William Dean:

I think on the onset they were very courteous and professional; they explained themselves. Things went far left when they tried to handcuff him. Prior to the attempt to handcuff him everything was perfect. It was peaceful, it was cordial, it was professional. I don't want to really, like armchair quarterback people in regards to, you know, their fighting skills or -- I mean, it was definitely a physical assault on the officers and they attempted to use the TASER, which is less lethal. I don't know what else I would have done.

82. Sergeant Dean was also asked "When you watched the video as a member of the internal affairs unit, you stated that you did not see anything that could have been done differently; correct?" And Sergeant Dean stated, "Correct."

83. As to the NPAA and the NFAA for Plaintiff, Sergeant Dean indicated there were "time restraints" involved; when asked if "those restraints" concerned Defendant Bottoms' 5:00 P.M.  press conference, Sergeant Dean answered, "I believe so." Sergeant Dean was further asked "So that's why the 4:45 at June 13 appears on the notice of proposed adverse action as the deadline for him to respond. Is that a fair statement?" to which Sergeant Dean responded, "Sounds fair to me."

## COUNT ONE
### 42 U.S.C. § 1983

**Fourth and Fourteenth Amendment—Seizure of Property Absent Due Process of Law, Against Defendants Bottoms, individually and in her official capacity, and Howard, individually.**

84. Plaintiff incorporates paragraphs 1-83 of this Complaint as if set forth here.

85. Plaintiff had myriad personal property stored in his apartment and had a possessory interest in the apartment itself.

86. Due to the actions of Defendants, Plaintiff's possessory interest in both his personal property and in the apartment itself was significantly interfered with.

87. Plaintiff lost *de facto* control and possession of the apartment and all personal property contained therein, significantly interfering with his property rights.

88. Due to the actions of Defendants, Plaintiff's life was put in danger and he was forced to flee his apartment and City, shuttling between a series of "safe houses."

89. Plaintiff had been informed by law enforcement sources that his life was in danger. Investigators with the City of Atlanta Office of Professional Standards acknowledged that it was not safe for Plaintiff to be anywhere within City.

90. A virtually lawless, Blood-controlled "Autonomous Zone" was a short drive from Plaintiff's apartment and he was receiving credible death threats.

91. Plaintiff's name had been publicized widely by Defendants Howard and Bottoms. Further, each of these Defendants stated that Plaintiff had committed a crime, murder, based on misrepresentations of widely-available video evidence.

92. Defendants acted with no regard for the likelihood of danger to Plaintiff's life.

93. Given the environment in which the events took place, it was apparent that any publication of Plaintiff's name would place him at risk of injury or death—Atlanta was literally burning and the National Guard would be deployed.

94. The danger Plaintiff would be placed in was an obvious consequence of the publication of Plaintiff's name coupled with the statements stigmatizing Plaintiff and imputing criminal actions to him; but for the actions of Defendants, Plaintiff's life would not have been placed in imminent and real danger and there would have been no need to flee his home or abandon his personal effects.

95. Any reasonable actor in Defendant Howard's or Bottoms' position would have foreseen the danger in which their acts necessarily placed Plaintiff as well as the necessity to flee for his life to avoid the danger created by Defendants.

96. Obviously, given the circumstances, property would have to be abandoned to protect Plaintiff's person; it was a natural and foreseeable consequence that the publication of Plaintiff's name coupled with false accusations of criminality would result in significant interference with Plaintiff's property.

97. The rioters' actions, as they related to Plaintiff, were encouraged and incited by Defendants Bottoms and Howard and the statements they continued to make.

98. Plaintiff was forced to abandon his property in order to protect life and limb and was afforded neither a meaningful opportunity to be heard, nor notice.

99. The acts of the Defendants served no legitimate government interest and were arbitrary and capricious. No rational or reasonable actor in the position of Defendants Bottoms or Howard would have acted in a like manner.

100. The Defendants' statements based on facts they knew, or should have known, were clearly false—these statements were made with actual malice.

101. At all times relevant to this Count, Defendant Howard and Bottoms acted as the final policy and decisionmaker for County and City, respectively, in making statement to media.

102. The acts complained of herein were in violation of clearly established law.

103. Directly and proximately due to the acts of Defendants, Plaintiff was unreasonably deprived of his property and absent notice, need, or cause.

## COUNT TWO

### 42 U.S.C. § 1983

**Violation of the Fourteenth Amendment— Stigma-Plus Reputational Due Process Injury Against Defendants Bottoms and Howard, individually and in their official capacities**

104. Plaintiff incorporates paragraphs 1-83 as if fully restated here.

105. Defendants Howard and Bottoms embarked upon a vitriolic public campaign designed to damage the personal reputation of Plaintiff, which deprived Plaintiff both property and liberty rights, and was related to his false arrest.

106. Less than 24 hours after the events described above, Defendant Bottoms embarked on a media tour; on June 13, 2020, Defendant Bottoms made statements implying moral fault: "While there may be debate as to whether this was an appropriate use of deadly force, I firmly believe that there is a clear distinction between what you can do and what you should do."

107. In the same appearance Bottoms stated ". . .  I have spent the better part of a day reviewing video footage involving allegations of excessive use [*sic*] by members of the Atlanta Police Department.  Tragically, the most recent incident involved the fatal shooting of a 27-year-old man, Rayshard Brooks."

108. Defendant Bottoms concluded "I do not believe that this was a justified use of deadly force and have called for the immediate termination of the officer."

109. In another press conference, held on June 14—the effective date of Plaintiff's dismissal—Bottoms publicly referred to the death of Mr. Brooks as "murder":

> "On Friday evening, we saw the *murder* of Rayshard Brooks.  And as I have said before, I am often reminded of the words of Dr. Martin Luther King, Jr. that there is a fierce urgency of now in our communities.  And that fierce urgency of now says that while our advisory committee continues to work to make recommendations to help us implement and review all of our policies in the City of Atlanta it is clear that we do not have another day, another minute, another hour to waste …."

110. Defendant Bottoms went on to grossly mischaracterize the circumstances of Plaintiff's use of force: "…the fact that I am standing here speaking about the

shooting and killing of a black man who was sleeping in a drive through restaurant shows that there is a significant disconnect."

111. It is clear from her statements that Bottoms was driven by personal anger:

> "I would venture to say when I saw him run…. he talked about his daughter's birthday and the first thing I thought when he ran was that he probably didn't want to be locked up over the weekend.  And I know that because I have had family members in that position.  They get locked up on the wrong day for something stupid. It didn't have to end that way.  It didn't have to end that way… It pissed me off, it makes me sad, and I'm frustrated, and nothing I can do is going to change what happened on Friday."

112. During a CNN town hall, Mayor Bottoms insinuated criminality on the part of Plaintiff; she unequivocally stated Brooks was "not confrontational[,]" he was "a guy that you were rooting for[,]" and made clear her emotional involvement: "[this] is so personal to so many people of color . . . That could have been any one of us . . . [and] in this case it was: it was someone's father[.]"

113. As a member of the Georgia bar and former judge, Defendant Bottoms was perfectly familiar with the elements of murder, that Brooks committed multiple crimes against Officer Brosnan and Plaintiff, and that the force used was as a matter of law "reasonable" and lawful. Put bluntly, she knowingly lied, when she accused Plaintiff of "murder" and using excessive force.

114. Defendant Bottoms further knew the following at the time of the statements:

(1)Brooks was a convicted felon who was not permitted, under Georgia law, to

possess Officer Brosnan's TASER; (2) Brooks was on probation and knew that he risked returning to prison if arrested for driving under the influence of alcohol; (3) Brooks was a member of a violent criminal street gang; (4) Brooks committed numerous forcible felonies on two uniformed APD officers before he was shot; (5) Books violently assaulted both Plaintiff and Officer Brosnan; and (6) the force used by both Plaintiff and Officer Brosna was reasonable, legal, and justified.

115. Over several days, Defendant Bottoms continued to make similar, disparaging public statements aimed at Plaintiff, occasionally mentioning Plaintiff by name. These statements were televised on national news shows such as "The View" aired on ABC, and "The Today Show" aired on NBC. Said statements were not required for the Bottoms to fulfill her duties as Mayor, nor were they in furtherance of her official mayoral duties. Instead, said statements were made to further her own political career and ambitions; her appearance was secured precisely because she was the sitting mayor of Atlanta. At all times, by representation and her personal statements, Defendant Bottoms was acting in her capacity as a public official and not as a private citizen when defaming Plaintiff.

116. Defendant Howard, who was in contact with Defendant Bottoms, sought to profit from the incident as well and went on his own press blitz.

117. On CNN, less than forty hours after the incident, on June 14, 2020, Defendant Howard stated "[Brooks] did not seem to present any kind of threat to anyone, and so the fact that it would escalate to his death just seems unreasonable." These statements were made after Defendant Howard's "investigators," learned of Brooks' violent assault of both Plaintiff and Officer Brosnan.

118. Defendant Howard made the following false statements on June 17, 2020, in connection with the announcement of Plaintiff's arrest: Plaintiff failed to render aid to Brooks; Plaintiff kicked Brooks after the shooting; Plaintiff delayed in giving aid to Brooks after the shooting; Plaintiff violated City of Atlanta Policies and Procedures; Brooks never presented himself as a threat; Brooks' possession of a Taser "presented no danger" to the officers or any other persons; Brooks was slightly impaired; Brooks was never informed that he was under arrest; the demeanor of the officers immediately after the shooting did not reflect any fear of Brooks; Plaintiff stated "I got him" at the time the shot was fired; it is unreasonable to use a service weapon when a suspect is fleeing.

119. At the press conference, Howard listed the purported "crimes" of Plaintiff: Aggravated Assault, § 16-5-21; Aggravated Assault with a Deadly Weapon, § 16-5-21; Criminal Damage to Property in the First Degree, § 16-7-22; Felony

Murder, § 16-5-1; and four counts of Violation of Oath By A Public Officer, § 16-10-1.

120. Defendant Howard appeared the next day on "expidiTIously" a talk show focusing on social issues hosted by rapper Clifford "T.I." Harris—in what was described as not a "traditional campaign stop."

121. On this talk show Defendant Howard made clear his behavior was not anomalous but rather represented a long-standing policy: he made a point of highlighting past practice as it related to pre-indictment action aimed at securing arrests of police officers at the behest of his office.

122. Defendant Howard falsely stated that Plaintiff and Officer Brosnan "kick[ed] Mr. Brooks when he was laying on the pavement."

123. Defendant Howard stated that standing on the body of Brooks—itself false—was more heinous than shooting him:

> For me, being an African American man, I would rather sentence you for standing on the body even above you shooting him. Because I think standing on a man's body is the ultimate insult—an insult not only to him but an insult to our community—because when he did that, this man laid in a public parking lot over at Wendy's and those policemen knew that there were many people standing there watching them, but they didn't care—they did it anyway.
> …
> But to your point, if you saw the video . . . when you see the conversation between [Mr. Brooks] . . . and these two officers . . . I agree with you because at that point if Mr. Brooks had been

another kind of man that there is no way that they would have continued to operate in the same way.

. . .

So, when Mr. Brooks tried to run . . . and I know that the public was somewhat mislead because they were shown a photograph or a video tape that showed Mr. Brooks firing the taser back at the officer and what they, what was said at that time is that is when the officer shot him . . . and so in my view the officer had no reason to fear Mr Brooks, he had no reason to fear that Mr. Brooks would harm anyone else.

…

And this is the thing that I think is critical for people trying to analyze this case: there is something in the law called excited utterance and that is when somebody in the heat of the moment makes a statement but they make the statement without having the time to consult with somebody . . . they just say what's on their mind. So in that moment, officer Rolfe said: "I got him." So if you interpret that doesn't sound like I'm scared of him or you I fear him; he said "I got him"—that's what he said.

. . .

We're going to make reducing police brutality a major function of the DA's Office . . . so we are going to set up a second department. . . to start to attack it . . . The issue with police brutality we felt is really important . . . We[, the black community,] are tired too. I'm tired; I'm tired of having to prosecute the cases; tired of going to the funerals; tired of going to the memorials . . . I don't think they're more tired than we are.

. . .

[Speaking about the speed of prosecutions of police officers, absent GBI investigation:] If I had to do it again what I would try to do; I would try to charge them a day earlier.

124. On June 18, 2020, the same day, with Andrea Mitchell on MSNBC, Defendant Howard stated that he and his staff:

"probably had visceral reactions when we saw the videotape of a surveillance tape showing the kick and showing Officer Brosnan standing on the body of Mr. Brooks. I could not imagine a circumstance that would illustrate a more total lack of respect for him and for what he represented. But you've also got to consider not only were they disrespecting Mr. Brooks, this action took place in an open parking lot at a restaurant where people were out filming them, and the officers, apparently that did not mean anything to them."

125. Defendant Howard's false, defamatory statements made in press conferences and in furtherance of his political ambitions outlined herein constitute clear violations of his oath of office; Defendant Bottoms' actions in condemning Plaintiff publicly without cause and making false accusations of wrongdoing as outlined herein constitute clear violations of her oath of office.

126. Neither Howard nor Bottoms was acting within the scope of their office.

127. Each statement would be readily understood by any reasonable listener to impute criminal conduct to Plaintiff: Defendants that insinuated that Plaintiff committed crimes, that through his conduct did not hold his fellow officer accountable, and that he failed to deescalate which led to Brooks' death. Such statements, made without meaningful investigation, with reckless disregard for the truth, in violation of the policies, city ordinances, procedures, customs, and practices of the City of Atlanta and the City of Atlanta Police Department, directly stigmatized Plaintiff and led to the losses noted in paragraph 129 *infra*.

128. Since the June 2020 international broadcast of Defendants Bottoms' and Howard's statements, Plaintiff was forced to abandon his home, suffered adverse employment change, arrest, intense public stigmatization, and very real danger.

129. Each of the stigmatizing statements was deeply related to the: 1, unreasonable seizure of Plaintiff's home and personal property; 2, the false arrest of Plaintiff; 3, the termination of Plaintiff; 4, the forced relocation of Plaintiff; and 5, loss of professional standing and licensure.

130. Each statement was made close in time to the above-enumerated harms.

131. A reasonable person hearing these statements would have related them to the above-enumerated losses.

132. The statements made by Defendants were false, made with knowledge of falsity, or with reckless disregard to the truth, and impugned Plaintiff's competence as a law enforcement officer, accusing him of criminality.

133. Each of these statements, individually and collectively, implied criminality.

134. These statements were the proximate cause of Plaintiff, literally, fleeing for his life. They resulted in the loss of personal property as well as Plaintiff's home. Defendants Howard and Bottoms false statements arbitrarily and illegally deprived Plaintiff of his property rights, absent due process. Further, the defamatory campaign of Defendants Howard and Bottoms deprived Plaintiff of

two distinct liberty interests: his interest in his chosen home and his residency in a particular locale, Atlanta. Further, the statements were closely related to his false arrest and unreasonable seizure of Plaintiff's property.

135. Defendants Howard and Bottoms were deliberately indifferent to Plaintiff's rights and caused damage to Plaintiff's reputation, humiliation, embarrassment, emotional anguish and distress, and loss of liberty and property interests.

136. Plaintiff has been irreparably harmed by the Defendants' unlawful, malicious, and defamatory actions and has been afforded no adequate name-clearing hearing; further, given the nature of the statement, their wide publication, and the lack of notice, it is doubtful that any name-clearing hearing could be constitutionally adequate: given the purposefully broad international publications of the false statements, no post-publicization hearing be adequate to cure the stigma placed on Plaintiff.

137. Defendants Howard and Bottoms, each individually were acting as a final policymaker in publishing these statements. On information and belief, no safeguards exist to prevent such publications.

138. At the time the statements were made, it was clear that they violated the established rights and no reasonable actor in Defendants' position would have acted in such a manner.

139. Plaintiff, Officer Brosnan, and other officers—not directly involved in the Brooks' incident—were properly serving in accordance with APD policy and law, utilizing *only* the reasonable amount of necessary force.

140. Plaintiff, is again serving as an APD officer who will continue to comply with APD policy with regard to use-of-force and in accordance with law.

141. There exists significant risk that Plaintiff, in carrying out his duties, may again need to utilize proper and reasonable force. There exists equally significant risk that County and City actors will publicize Plaintiff's name, without benefit of an actual investigation, yet again, falsely accusing Plaintiff of criminality and putting him at real risk of bodily injury and irreparable harm.

142. Plaintiff requests an order enjoining County and City actors from publishing or publicizing names of APD officers accused of use-of-force violations prior to the conclusion of either a GBI investigation or an internal APD investigation.

143. The Plaintiff further prays for compensatory and uncapped punitive damages, attorneys' fees, expert fees, costs, per se damages, and pre-judgement and post-judgement interest against Defendants Howard, and Bottoms.

## COUNT THREE

### 42 U.S.C. § 1983

**Violation of Fourth and Fourteenth Amendments—Unreasonable Seizure**
**Against Defendants Hannah, individually and in his official capacity, Rucker,**

**individually and in his official capacity, and Howard, individually and in his official capacity**

144. Plaintiff incorporates paragraphs 1-83 as if set forth fully herein.

145. Defendants Hannah, Rucker, and Howard secured an arrest warrant, under process of law, against Plaintiff for: Felony Murder §16-5-1, Aggravated Assault, §16-5-21; Criminal Damage to Property in the First Degree, § 16-7-22; and Violation of Oath by Public Officer, §16-10-1.

146. Specifically, Defendants Hannah, Rucker, and Howard acting individually and in concert, knowingly withheld and misrepresented material and exculpatory facts which vitiated probable cause for arrest.

147. Defendants Hannah, Rucker, and Howard were aware of each and every one of the following facts, but chose to either conceal or misrepresent them, in spite of the fact that individually and collectively the facts vitiate probable cause: (1) Officer Brosnan and Plaintiff were assaulted, injured, hospitalized, and had reason to believe that Brooks was extremely dangerous; (2) that Brooks was extremely intoxicated on numerous substances; (3) that Plaintiff sprinted to obtain his personal first aid kit; (4) that Officer Brosnan never "stood" on Brooks, nor did anything that would constitute Aggravated Assault under Georgia law, (5) that Plaintiff never kicked Brooks, and (6) that Plaintiff and Officer Brosnan

called for EMS immediately and administered first aid to Brooks, including CPR, until they were relieved by EMS.

148. Defendant Howard was the final policymaker as to County policies dictating investigatory practices; all Defendants, as relate to this Count, were acting in accordance with those policies, in a non-prosecutorial capacity as County actors.

149. To the extent that Defendants Hannah, Rucker, and Howard, investigated the incident in order secure an arrest warrant for Plaintiff that lacked probable cause, said actions were outside the course and scope of their employment.

150. Defendants Hannah, Rucker, and Howard misrepresented, misstated, and concealed material facts, which were exculpatory and made false inculpatory statements; at all times, Defendants knew or should have known that the statements were false and that the statements vitiated probable cause.

151. Defendants Hannah, Rucker, and Howard knew or should have known that: (1) Plaintiff's patrol car did not have a first aid kit; (2) that Plaintiff immediately called for medical assistance; (3) that Plaintiff immediately upon recovering a personal first aid kid, administered aid; (4) that a total of one minute twenty-nine seconds passed during which time the scene was secured, medical assistance was called, and Plaintiff secured a first aid kit; and 5) that any "failure to provide assistance" was neither willful nor intentional.

152. Defendants Hannah, Rucker, and Howard knew or should have known that Plaintiff did not kick Brooks.

153. Defendants Hannah, Rucker, and Howard knew or should have known that Brooks violently and feloniously assaulted both Plaintiff and Officer Brosnan: punching Plaintiff in the face and hitting Officer Brosnan with such force as to cause a concussion as well as shooting Brosnan with a TASER.

154. Defendants Hannah, Rucker, and Howard knew or should have known that Plaintiff's conduct was authorized under Georgia law, §§ 16-3-20, 16-3-21 & 17-4-20.

155. As a result of the maliciously procured arrest warrants which lacked probable cause, Plaintiff was deprived of his liberty and imprisoned at the Fulton County Jail *without bond*. Plaintiff was transferred to another jail and kept in solitary confinement to protect him from inmates. Plaintiff was incarcerated for *thirteen days*.

156. At the time Defendants Hannah, Rucker, and Howard secured said warrants, they lacked probable cause to believe that Plaintiff had committed any crime.

157. Defendants Hannah, Rucker, and Howard lacked any good faith basis to believe that probable cause existed to support criminal charges against Plaintiff.

158. As a direct and proximate cause of the actions of each defendant acting individually and all Defendants working in concert, Plaintiff was wrongfully arrested, suffered, and continues to suffer the injuries described above.

159. At all relevant times Defendants knowingly, with reckless disregard for the truth, and deliberate indifference to clearly established rights, misrepresented or concealed material facts resulting in the wrongful arrest of Plaintiff.

160. All "charges" were dismissed without presentment to a grand jury.

161. No reasonable, prosecutor, investigator, or district attorney would have believed that the conduct of Defendants Hannah, Rucker, and Howard set forth in this count was lawful, reasonable, or constitutional.

162. The above acts resulted in both a denial of due process and a constitutionally unreasonable seizure and no reasonable actor would be unaware of this.

## **COUNT FOUR**

### **O.C.G.A. § 51-7-1**
**False Arrest and Violation of Plaintiff's Rights Under the Georgia Constitution Against Defendants Hannah, Rucker, and Howard**

163. Plaintiff incorporates by reference the paragraphs 144-162 as if set forth here.

164. Defendants caused the false arrest of Plaintiff by committing the acts specifically complained of above thereby violating Georgia law and violating Plaintiff's rights under the Georgia Constitution.

165. Defendants' actions caused damages to Plaintiff including but not limited to loss of income, and loss of and damage to their professional reputations, as well as mental and emotional anguish.

## COUNT FIVE

### Ratification Against Defendant Howard

166. Plaintiff restates paragraphs 1-83 and 145-162 as if fully restated here.

167. Section 51-1-12 details liability for ratifying a tort.

168. Defendants Hannah and Rucker committed multiple torts for the perceived benefit, political and otherwise, of Defendant Howard.

169. Through his public comments, Defendant Howard clearly ratified the tortious actions of Defendants Hannah and Rucker, for his own benefit specifically including but not limited to, political gain and advancement of his career.

170. Defendant Howard ratified the tortious actions of Defendants Hannah and Rucker by failing to properly investigate or pursue any effort to examine the evidence available to him to confirm that probable cause existed.

171. Defendant Howard had full knowledge of all material facts that the arrest of Plaintiffs was based on an insufficient investigation and material misrepresentations or omissions of fact which vitiated probable cause.

172. Defendant Howard remained willfully ignorant or purposefully did not seek further information before ratifying the unlawful arrest of Plaintiff despite that true and accurate information was readily ascertainable upon diligent effort to investigate the events leading to Plaintiffs' unlawful arrests.

173. The facts contained herein demonstrate that Defendant Howard's conduct would cause inequity to others if Defendant Howard were allowed to assert that he has not ratified the unauthorized acts of Defendants Hannah and Rucker.

174. Defendant Howard's ratification independently caused damages to Plaintiff including but not limited to loss of income, and loss of and damage to their professional reputations, as well as mental and emotional anguish.

## **COUNT SIX**

### **42 U.S.C. § 1983**
**Fourth and Fourteenth Amendment—Negligent Training and Supervision**
***Monell* Claims Against Defendant Fulton County**.

175. Plaintiff restates and realleges paragraphs 1-83 as if set forth here at length.

176. Fulton County, either intentionally, or by deliberate indifference, created a *de facto* policy, practice, or custom of condemning police officers absent due process of law. Defendant Fulton County knew or should have known that such constitutional violations were occurring or were likely to occur.

177. Fulton County placed training and supervision responsibilities for County employees tasked with investigatory duties in the hands of Defendant Howard. Defendant Howard was likewise the final decisionmaker for the training of County-employee Assistant District Attorneys and Investigators.

178. Fulton County's final decision and policy making body is the Board of Commissioners; the final decisionmaker for Fulton County employees working at the Fulton County District Attorney's Office at the relevant time was Defendant Howard.

179. Fulton County, by and through its final decisionmaker Defendant Howard, failed to supervise and train Fulton County employees adequately. This occurred not in their training as prosecutors, but instead was the result of training and supervision related to investigatory functions aimed at establishing probable cause to secure arrest.

180. Further, there existed a public and stated policy of "speedy investigations," which were not only constitutionally inadequate, but involved the concealment of exculpatory evidence, fabrication of evidence, and misrepresentation of evidence. *Supra* ¶¶ 144-162.

181. At the direction of Defendant Howard and pursuant to policy set by him acting as a final policy maker for Fulton County, Fulton County employees conducted

constitutionally inadequate first-instance, probable cause investigations to secure the arrest of Plaintiff, Officer Rolfe, and at least six other APD officers. Fulton County employees secured arrest warrants based on these constitutionally inadequate investigations based on affidavits which contained material omissions and misrepresentations which vitiated probable cause.

182. Defendant Howard widely published this practice and policy in local, national, and international media. *See, e.g.*, *supra* ¶ 121.

183. In spite of this wide publication and knowledge, no steps were taken by Fulton County to alter Howard's practices with regard to his supervision of Fulton County employees, to provide additional or remedial training to Fulton County employees, to strip Howard of his authority over Fulton County employees, to appoint a secondary or alternative supervisor over those Fulton County employees, to implement additional policies or alternative guidelines, or to remove those Fulton County employees from the direct supervision of Howard.

184. Fulton County either knew of the constitutional violations arising from Howard's supervision and training of Fulton County employees or were recklessly indifferent to a clear and almost certain likelihood of constitutional violations arising from the training and supervision of such employees.

185. Defendants Rucker and Hannah were Fulton County employees who acted in accordance with their grossly inadequate training and supervision under Howard.

186. The lack of adequate or appropriate supervision or training of Defendants Rucker and Hannah directly led to the violation of Plaintiff's Fourth Amendment described in Counts Three *supra*.

187. Further, this lack of adequate or appropriate supervision or training of Defendants Rucker and Hannah was a proximate cause of the loss of Plaintiff's property and his good name, absent due process, and his false arrest.

188. Defendant Howard publicly announced that he, his investigators, and the assistant district attorneys he supervised —a multitude of these investigators and assistant district attorneys were County employees—had created either a habit, custom, or policy of arresting police officers prior to the issuance of an indictment and undertaking police-style probable cause investigations: that this practice was implemented "all the time."

189. The Fulton County Board of Commissioners, not only failed to put in place proper supervision, policies, and customs, but also actively put forth policy statements which created an environment encouraging other County-level actors to act in a like manner. Specifically, the Fulton County Board of Commissioners,

on June 17, 2020 before any investigation was completed or conducted, passed a resolution stating:

> WHEREAS, minorities, not only in history, but in our current time, have *consistently been devalued and dehumanized by authorities in the criminal justice system*; WHEREAS, on June 12, 2020, the *murder of another unarmed black man*, Rayshard Brooks, while fleeing from the police with a non-lethal weapon in his hand, immediately upon the heels of the death of George Floyd, also at the hands of law enforcement . . .

190. The actions, customs, lack of training, and policies created by Fulton County by and through its final decision and policymakers proximately caused numerous constitutional violations—each set forth above in Counts One through Four—which were the natural consequence of that custom, lack of training, lack of supervision, and enactment of policy.

191. None of the actions complained of in the instant Count were reasonable, and no reasonable actor in a situation similar to that of the final decisionmaker would fail to supervise and train or put in place policies and customs of the sort complained of herein.

192. Defendant Howard knew, or should have known, that his staff was violating the rights of certain accused parties, because of the investigatory policies and customs he encouraged.

193. Defendant Howard specifically encouraged hasty investigations and dubious investigatory policies in cases where he believed it politically advantageous to effect an arrest and garner positive media attention.

194. Further, Defendant Howard actively encouraged emotionally involved investigators to work on investigations, encouraging an "us" and "them" adversarial investigatory process that stripped investigators of objectivity and placed racial tensions and broader social tensions to the forefront.

195. Investigators were allowed, if not encouraged, in an ends-justify-the-means practice, to reach a desired outcome regardless of objective evidence—Defendant's Hannah and Rucker in particular acted to suppress exculpatory evidence and to misrepresent fact in order to secure an arrest warrant and ultimately charges, both without probable cause.

196. As a direct and proximate cause of the lack of training, lack of supervision, and of the policies and customs of Fulton County Plaintiff was denied his rights in clear violation of the Constitution of the United States.

197. As a direct and proximate result of the policies and customs, as well as due to the lack of supervision and training, of each of the Defendants, Plaintiff's constitutional rights were violated in two distinct ways: 1), his property and

person were seized absent due process and in violation of the Fourth Amendment; and 2), his good name and reputation were damaged absent due process.

198. The acts complained of caused damages to Plaintiff including but not limited to loss of income, and loss of and damage to his professional reputation, as well as mental and emotional anguish.

## COUNT SEVEN

### Ratification Against Defendant Bottoms

199. Plaintiffs restate paragraphs 1-83, as if fully restated here.

200. Section 51-1-12 details the liability for ratifying a tort.

201. Through her public comments, it is clear that Defendant Bottoms ratified the tortious actions of Defendant Shields, for her own benefit specifically including but not limited to political gain and advancement of her career.

202. Defendant Bottoms knew Plaintiff was terminated in violation of his due process rights and facilitated his termination.

203. To the extent that Defendants Bottoms' actions ratified improper and or unlawful said acts were outside the course and scope of her employment.

204. Defendant Bottoms' actions caused damages to Plaintiff including but not limited to loss of income, and loss of and damage to his professional reputation, as well as mental and emotional anguish.

## COUNT EIGHT

### 42 U.S.C. § 1983
**Equal Protection against Defendants Shields and Bottoms, in their official and individual capacities.**

205. Plaintiffs restate paragraphs 1-83 as if fully restated here.

206. Defendants Shields and Bottoms violated Plaintiff's right to equal protection by, among other things, subjecting Plaintiff to discriminatory and disparate treatment not otherwise imposed on similarly situated persons; more specifically, taking action to terminate Plaintiff without investigation and in violation of numerous policies City and APD.

207. Defendants Shields and Bottoms wrongly disciplined and terminated Plaintiff.

208. Plaintiff was more than adequately qualified for his position, with years of experience and hundreds of hours of specialized law enforcement training.

209. Plaintiff was a member of a group against whom there existed popular ongoing public protests. Plaintiff was a member of a then-publicly-excoriated and politically reviled group. Plaintiff was, at heart, unpopular, subject to public outrage, and treated differently solely because of that disdain and unpopularity.

210. Employees who were not publicly reviled, or subject to then-ongoing public protests, had been accused of using excessive force and were granted more favorable treatment, primarily by affording them due process protections

guaranteed under federal and state law, as well as APD Policy and City ordinance. Further, those employees were given adequate notice and a meaningful opportunity to participate in a hearing and respond.

211. Shields and Bottoms had no rational basis for discipline or termination.

212. At all times relevant hereto, the law was clearly established that the actions of Defendants Shields and Bottoms violated the equal protection clause of the Fourteenth Amendment to the United States Constitution. No reasonable actor in the position of Defendant would have acted in like manner.

213. To the extent that Bottoms participated in the disciplinary action or influenced the same she acted outside of the scope of her duties.

214. To the extent that Defendant Shields undertook to terminate Plaintiff disregarding virtually all policies, ordinances, and procedures required to ensure due process, she acted outside of the scope of her duties.

215. Defendants Shields and Bottoms acted intentionally and with callous disregard for Plaintiff's known statutory and constitutional rights.

216. As a direct and proximate result of the actions of Defendants Shields and Bottoms, Plaintiff has been deprived of rights to which he was entitled and suffered damages including financial damage, emotional distress, mental anguish, inconvenience, loss of income, humiliation, and other indignities.

## COUNT NINE

### 42 U.S.C. § 1983

**Fourteenth Amendment—Civil Rights Conspiracy Resulting in Violation of Due Process Against Defendants Bottoms, in her official and individual capacity, Shields, in her official and individual capacity, Hannah, individually and in his official capacity, Rucker, individually and in his official capacity, and Howard, individually and in his official capacity.**

217. Plaintiff restates paragraphs 84-103, 105-143, 145-162, 206-216, as if fully restated here.

218. On information and belief, Defendants Howard, Bottoms, and Shields were in communication regarding the investigation, discipline, and arrest of Plaintiff. This much was stated to media. Defendants Howard and Bottoms, made statements which were coordinated in time, content, and tone.

219. On information and belief, each was aware of the actions of the other in furtherance of the conspiracy and in communication regarding actions that would be taken against Plaintiff; further, tortious acts appeared to be coordinated to allow for media appearances of Bottoms and Howard.

220. On information and belief, the acts of Defendant Bottoms, Shields, and Howard shared the same aim, namely causing Plaintiff harm absent constitutionally adequate safeguards or investigation for perceived political benefit.

221. On information and belief, Defendant Howard, Bottoms, and Shields reached either an explicit or tacit agreement to act in concert in furtherance of this aim.

222. Defendants Howard and Bottoms each caused the wide publication of stigmatizing statements, which both knew to be or should have known to be false. These statements were made specifically in connection with the false arrest of Plaintiff and encouraged or incited significant interference with Plaintiff's property. Further, these statements led directly to Plaintiff needing to flee his chosen and established home to protect his life. But for the acts of Defendants, Plaintiff's life would not have been in imminent danger.

223. Defendant Howard utilized his position in furtherance of this aim, recruiting Defendants Rucker and Hannah. Defendants Rucker and Hannah were in regular communication with Defendant Howard.

224. On information and belief, Defendants Rucker, Hannah, and Howard, had extensive communication about Plaintiff, future actions to be taken against Plaintiff, timing of such actions, and coordinating such actions to ensure maximum impact upon Plaintiff and benefit for Howard.

225. Defendants Rucker and Hannah either directly pursuant to instructions of Howard or through their own independent volition assisted Howard in his aims and acts by: 1, conducting a clearly inadequate first-instance investigation aimed at the arrest of Plaintiff; 2, coordinating the issuance of Plaintiff's arrest warrant allowing Defendant Howard to hold a press conference within minutes of the

issuance of such warrant; 3, obtaining that selfsame arrest warrant based on sworn material misrepresentations and omissions of fact; and 4, causing the arrest of Plaintiff absent probable cause.

226. Absent the agreement and participation of Defendants Rucker, Hannah, and Shields, Defendants Howard and Bottoms statements imputing criminality would have carried significantly less credibility and would not have been accompanied by an actual termination, seizure, and arrest of Plaintiff.

227. Plaintiff was deprived of rights secured by the Constitution through the concerted acts of the Defendants named in the instant Count.

## <u>COUNT TEN</u>

**Civil Conspiracy Against Defendants Hannah, Rucker, Shields, Bottoms, and Howard**

228. Plaintiff incorporates by reference the preceding paragraphs 217-227 as if set forth fully herein, and states further:

229. Specifically, Defendants Rucker, Shields, Hannah, Bottoms, and Howard, acting individually and in concert, knowingly conspired to violate Plaintiff's rights under the Georgia Constitution and in fact did violate Plaintiff's right under the Georgia Constitution to both due process, to be free from false arrest, and to be free from unreasonable seizure.

## COUNT ELEVEN

### 42 U.S.C. § 1983
**Fourth and Fourteenth Amendment—Negligent Training and Supervision**
***Monell* Claims Against Defendant City of Atlanta**.

230. Plaintiff restates and realleges paragraphs 1-83 as if set forth here at length.

231. The City of Atlanta, by and through its final policymaker, Defendant Bottoms, created an environment where due process was refused police officers accused of certain misconduct, namely excessive force. Mayor Bottoms not only knew of this practice and the high likelihood of clear constitutional violation, but actively participated in the process and encouraged others to do the same.

232. Prior to any investigation, of any sort, Mayor Bottoms caused Plaintiff to be terminated without either adequate notice or opportunity to be heard.

233. Prior to any investigation, Mayor Bottoms began making the national news "rounds"; during this press blitz, Mayor Bottoms identified Plaintiff by name as a murderer—this occurred less than 24 hours after the incident.

234. There was a seizure of significant portions of Plaintiff's personal property which can be directly traced to the custom, culture, and practices which Mayor Bottoms actively encouraged and participated in. This unreasonable seizure was temporally proximate and intimately related to the defamatory statements made.

235. Comments made by Mayor Bottoms related at length above, publicly condemned and stigmatized Plaintiff prior to either a completed investigation, of the APD, the Office of Fulton County District Attorney, or the GBI.

236. As a result of both the direct acts of Mayor Bottoms, as a final decision and policymaker, and the policies, practices and customs of the City of Atlanta, Plaintiff was forced to abandon his apartment and virtually all of his personal property in order to protect his own life; his life was only in danger due to the wide publication of his name in connection with the public pronouncement of his guilt by Bottoms and other city officials.

237. Plaintiff had no meaningful opportunity to be heard and was deprived of this property, and his good name, absent due process.

238. Defendant City of Atlanta demonstrated this pattern, practice, and custom in terminating Investigators Streeter and Gardner approximately ten days earlier in complete contravention of their due process rights as guaranteed under the duly passed municipal ordinances of the City of Atlanta and their rights under the United States and Georgia Constitutions.

239. City of Atlanta, either intentionally, or by deliberate indifference, created a *de facto* policy, practice, or custom of condemning police officers absent due

process of law. Defendant Bottoms either knew or should have known that such constitutional violations were occurring or were likely to occur.

240. City of Atlanta acting through the final decisionmaker, Defendant Bottoms, failed to provide policies, training, or supervision to prevent predictable constitutional violations. Defendant Bottoms either knew or should have known of the violations which occurred or were likely to occur.

241. On information and belief, the City of Atlanta **provides no training to any employee** relating to deprivation of reputational liberty or the required due process prior to publishing stigmatizing statements.

242. On information and belief, the City of Atlanta's training as it relates to due process and the deprivation of property is woefully inadequate.

243. Given the lack of training, constitutional violations were foreseeable and near inevitable, especially where City officials were making statements to media outlets imputing criminality prior to the conclusion of any investigation.

244. City of Atlanta placed training responsibilities for City employees with Defendant Bottoms. Defendant Bottoms was likewise the final decisionmaker for the training of City employees. City of Atlanta's final decision and policymaking body is the City of Atlanta City Council; the final decisionmaker of the City of Atlanta City Council at the relevant time was Defendant Bottoms.

245. The City of Atlanta, not only failed to put in place proper supervision, policies, and customs, but also actively put forth policy statements which created an environment which encouraged other city-level actors to act in a like manner.

246. The actions, customs, lack of training, and policies created by The City of Atlanta by and through its final decision and policymakers proximately caused numerous constitutional violations, which were the natural consequence of that custom, lack of training, lack of supervision, and enactment of policy.

247. The City of Atlanta, by and through its final decisionmaker Defendant Bottoms, failed to supervise and train its media-facing employees specifically as it related to public pronouncements and investigations.

248. As a direct and proximate result of the lack of supervision and training, Plaintiff's constitutional rights were violated in two distinct ways: 1), his property was seized absent due process; and 2), his good name and reputation were damaged absent due process.

249. The damage done to Plaintiff's good name directly impacted his finances, his ability to secure employment, and did him economic harm. Each of these results was foreseeable. Even full expungement of all records of his arrest and charges under Georgia law will not prevent any law enforcement agency, licensing board,

or security clearance investigation from learning about his arrest and charges. Further, the media records of the events will forever be available on the internet.

250. The acts complained of caused damages to Plaintiff including but not limited to loss of income, and loss of and damage to their professional reputations, as well as mental and emotional anguish.

## COUNT TWELVE

### VIOLATION OF RIGHTS SECURED UNDER GEORGIA CONSITUTION, ARTICLE I, § 1, ¶ II AGAINST DEFENDANTS SHIELDS AND BOTTOMS

251. Plaintiffs restate paragraphs 205-216, as if fully restated here.

252. The Georgia Constitution protects the equal protection rights of its citizens, stating "No person shall be denied the equal protection of the laws."

253. Defendants Bottoms and Shields arbitrarily subjected Plaintiff to adverse and unequal treatment under Georgia law, thereby they violated both the U.S. and Georgia Constitutions. As a direct and proximate result of Defendants Bottoms' and Shields' actions, Plaintiff suffered irreparable harm and damages, including financial damage, emotional distress, mental anguish, inconvenience, loss of income and benefits, humiliation, and other indignities.

## <u>COUNT THIRTEEN</u>
**Punitive Damages**

254. Plaintiff incorporates by reference the preceding paragraphs as if set forth fully herein, and states further:

255. Defendants Hannah, Howard, Rucker, Shields, and Bottoms acted with specific intent to harm Plaintiff and with wanton disregard of the consequences of their actions.

256. As noted herein, Defendants acted maliciously, intentionally, with complete indifference as to the damage which was likely to and actually did befall Plaintiff.

## <u>PRAYER FOR RELIEF</u>

Plaintiff respectfully request the following relief:

A. That all Defendants be served with a copy of the Summons and Complaint in this case;

B. That all Defendants be required to timely answer the allegations and averments contained in the Complaint;

C. Declaratory judgement that Defendants violated Plaintiff's rights;

D. Compensatory damages against Defendants in an amount in excess of seventy-five thousand dollars ($75,000) to be determined at trial by jury;

E. For an award of reasonable attorney's fees and costs expended pursuant to the Civil

Rights Act of 1871, <u>42 U.S.C. § 1988</u>, <u>28 U.S.C. § 1920</u>; and, <u>O.C.G.A. § 13-6-11</u>;

F.  Punitive damages against Defendants Bottoms, Shields, Hannah, and Howard -all individual defendants-as to all applicable Counts;

G.  A trial by jury upon all claims and matters for which a jury can be empaneled;

H.  Award to Plaintiff, from the Defendants, all the monetary damages to which he is entitled, in order to fully compensate him for the harms inflicted upon him; and

I.  Award such other and further relief as this court deems just and proper.

This ____day of _____, 202__.

LoRusso Law Firm, P.C.

By: _____
Lance J. LoRusso
Georgia Bar No. 458023
Ken Davis
Georgia Bar No. 705045

1827 Powers Ferry Road, S.E.
Atlanta, Georgia 30339
Phone: 770-644-2738
Fax: 770-644-2379
lance@lorussolawfirm.com
*Counsel for Plaintiff*

THIS DOCUMENT APPEARS IN TIMES NEW ROMAN 14 POINT FONT.