IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DEVIN BROSNAN & GARRETT       :
ROLFE,                        :
                              :
        Plaintiffs,           :
                              :
v.                            :       CIVIL ACTION NO.
                              :       1:22-cv-02337-LMM
                              :
KEISHA LANCE BOTTOMS et al.,  :
                              :
                              :
        Defendants.           :

## <u>ORDER</u>

This case comes before the Court on Plaintiff's Motion for Leave to File a

Second Amended Complaint [150] and Defendants' Motions to Dismiss [106,

108, 109, 110, 113, 115, 116, 125, 126]. After due consideration, the Court enters

the following Order:

## I.    BACKGROUND[1]

Plaintiffs are two Atlanta City Police Department ("APD") officers asserting

various § 1983 and state law claims against Defendants. Defendants are Keisha

Lance Bottoms, former Mayor of Atlanta; the City of Atlanta; Fulton County; Paul

Howard, the former Fulton County District Attorney; Clint Rucker, a former

Fulton County Assistant District Attorney; Donald Hannah, a former criminal

---

[1] The facts in this section are from Plaintiffs' Complaints, Dkt. Nos. [101, 103],
and taken as true unless otherwise stated.

investigator with the Fulton County District Attorney's Office; and Erika Shields, the former APD Police Chief.

This case arises from Plaintiffs' fatal encounter with a man named Rayshard Brooks at an Atlanta Wendy's in June 2020. Plaintiff Brosnan was dispatched to the Wendy's after an employee called 911, stating that she believed Brooks was driving a vehicle while intoxicated. Dkt. No. [101] ¶¶ 28–29; Dkt. No. [103] ¶¶ 25–27. Plaintiff Brosnan determined that Brooks was under the influence of alcohol or other substances and called for support from Plaintiff Rolfe. Dkt. No. [101] ¶ 31; Dkt. No. [103] ¶ 28. After Plaintiffs placed Brooks under arrest for operating a vehicle while impaired, Brooks punched Rolfe, brought Brosnan to the ground, stole Brosnan's TASER, and shot the TASER at Brosnan. Dkt. No. [101] ¶¶ 34–35; Dkt. No. [103] ¶¶ 30–33. Brooks ran from Plaintiffs, and Plaintiff Rolfe fired his TASER at Brooks twice. Dkt. No. [101] ¶¶ 36–37. Brooks then pointed the stolen TASER at Plaintiff Rolfe, who alleges that he heard a shot like a gunshot and observed a flash. Id. ¶¶ 38–39; Dkt. No. [103] ¶¶ 38–39. In response, Plaintiff Rolfe fired his service weapon and shot Brooks. Dkt. No. [101] ¶ 39. Brooks's pulse stopped, and Plaintiff Rolfe conducted CPR until EMS arrived. Id. ¶ 41. Brooks died from his injuries. Plaintiff Brosnan received treatment for his injuries. Dkt. No. [103] ¶ 44. Almost immediately after the incident, Plaintiff Rolfe was terminated. Dkt. No. [101] ¶¶ 46–59. Plaintiff Brosnan was put on administrative duties without pay. Dkt. No. [103] ¶ 188.

Defendants Howard and Bottoms quickly scheduled multiple media appearances, in which they condemned Plaintiffs' actions, and Defendant Howard began an investigation into the incident. Dkt. No. [101] ¶¶ 60, 63; Dkt. No. [103] ¶ 89. Defendants Howard and Bottoms discussed the incident with various platforms, insinuating that Plaintiffs unjustifiably murdered Brooks. Dkt. No. [101] ¶¶ 105–24; Dkt. No. [103] ¶¶ 89–112.

Within five days of the incident, Defendant Howard instructed Defendant Hannah to obtain an arrest warrant for Plaintiffs. Dkt. No. [101] ¶ 66. Plaintiffs allege that Defendant Hannah omitted exculpatory evidence and included false statements in his affidavit supporting the arrest warrant. Id. ¶ 67; Dkt. No. [103] ¶ 57. Plaintiffs were both incarcerated after execution of the warrant. Dkt. No. [101] ¶ 155; Dkt. No. [103] ¶ 143. Plaintiff Brosnan's personal cell phone was also seized pursuant to a search warrant in connection with Defendant Howard's investigation. Dkt. No. [103] ¶ 152. All charges against Plaintiffs were later dismissed without presentment to a grand jury.

The Georgia Attorney General appointed Peter Skandalakis to conduct an investigation, and Skandalakis dismissed the case against Plaintiffs. Dkt. No. [101] ¶¶ 78, 160; Dkt. No. [103] ¶ 148. Skandalakis found that Plaintiffs acted in accordance with state and federal law. Dkt. No. [101] ¶ 78. Plaintiff Rolfe appealed his termination and was reinstated after a finding that he was not afforded due process in his termination. Id. ¶ 79.

Based on these facts, Plaintiff Rolfe alleges thirteen counts: (1) unconstitutional seizure of property against Defendants Howard and Bottoms; (2) stigma-plus defamation against Defendants Howard and Bottoms; (3) unreasonable seizure against Defendants Howard, Rucker, and Hannah; (4) state law false arrest against Defendants Howard, Rucker, and Hannah; (5) tort ratification against Defendant Howard; (6) negligent training and supervision against Defendant Fulton County; (7) tort ratification against Defendant Bottoms; (8) federal equal protection violations against Defendants Bottoms and Shields; (9) federal civil rights conspiracy against all individual Defendants; (10) state law civil conspiracy against all individual Defendants; (11) negligent training and supervision against Defendant City of Atlanta; (12) state law equal protection violations against Defendants Bottoms and Shields; and (13) punitive damages. Dkt. No. [101].

Plaintiff Brosnan brings eleven counts: (1) unconstitutional seizure of property against Defendants Howard and Bottoms; (2) stigma-plus defamation against Defendants Howard and Bottoms; (3) unreasonable seizure against Defendants Howard, Rucker, and Hannah; (4) unreasonable property seizure against Defendants Howard, Rucker, and Hannah; (5) state law false arrest against Defendants Howard, Rucker, and Hannah; (6) negligent training and supervision against Defendant Fulton County; (7) negligent training and supervision against Defendant City of Atlanta; (8) federal civil rights conspiracy against all individual Defendants; (9) state law civil conspiracy against all

4

individual Defendants; (10) tort ratification against Defendant Howard; and (11) punitive damages. Dkt. No. [103].

Plaintiffs seek leave to amend their First Amended Complaints based on new case law from another court in this District. Dkt. No. [150]. Defendant Fulton County opposes Plaintiffs' Motion, arguing that amendment would be futile because Plaintiffs have failed to state a claim against Fulton County. Dkt. No. [154]. Defendants City of Atlanta, Bottoms, and Shields ("the City Defendants") also oppose Plaintiffs' Motion, stating that the new case law does not change Plaintiffs' status, so amendment would be futile.[2] Dkt. No. [155].

Defendants also move to dismiss Plaintiffs' Complaints. Defendants Howard, Hannah, and Rucker ("the District Attorney Defendants" or "the DA Defendants") move to dismiss Plaintiffs' claims, asserting sovereign, absolute, official, and qualified immunity. Dkt. Nos. [106, 109–10, 125–26]. Defendants Shields and Bottoms move to dismiss on qualified immunity grounds and for failure to state a claim. Dkt. Nos. [115–16]. Defendants City of Atlanta and Fulton County allege that Plaintiffs have failed to establish Monell liability against them. Dkt. Nos. [108, 113, 115–16].

---

[2] Defendants Howard, Hannah, and Rucker join the City Defendants in this briefing. Dkt. No. [155] at 4.

## II.    LEGAL STANDARDS

### A. Motion to Amend: Rule 15

Federal Rule of Civil Procedure 15(a)(2) provides that a court "should freely give leave" to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). Even so, granting leave to amend is not automatic. Faser v. Sears, Roebuck & Co., 674 F.2d 856, 860 (11th Cir. 1982); Layfield v. Bill Heard Chevrolet Co., 607 F.2d 1097, 1099 (5th Cir. 1979). District courts have "extensive discretion" in deciding whether to grant leave to amend and may choose not to allow a party to amend "when the amendment would prejudice the defendant, follows undue delays, or is futile." Campbell v. Emory Clinic, 166 F.3d 1157, 1162 (11th Cir. 1999) (citations omitted); see also Foman v. Davis, 371 U.S. 178, 182 (1962) (listing undue delay, bad faith or dilatory motive, repeated failures to cure deficiencies, undue prejudice to opposing party, and futility as factors to consider under Rule 15(a)).

### B. Motions to Dismiss: Rule 12(b)(1)

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may be based on a facial or factual challenge to the complaint. McElmurray v. Consol. Gov't of Augusta-Richmond Cnty., 501 F.3d 1244, 1251 (11th Cir. 2007). A facial attack "requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction," and for purposes of the motion, allegations in the complaint are taken as true. McElmurray, 501 F.3d at 1251 (alterations adopted) (quoting Lawrence v.

Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990)). A factual attack challenges "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered." Id. (quoting Lawrence, 919 F.2d at 1529).

On a factual attack of subject matter jurisdiction, a court's power to make findings of facts and to weigh the evidence depends on whether the jurisdictional attack also implicates the merits of plaintiff's claim. Garcia v. Copenhaver, Bell & Assocs., 104 F.3d 1256, 1261 (11th Cir. 1997). "If the facts necessary to sustain jurisdiction do not implicate the merits of plaintiff's cause of action . . . the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. . . no presumptive truthfulness attaches to plaintiff's allegations. Id. (quoting Lawrence, 919 F.2d at 1259). However, if the attack on subject matter jurisdiction "implicates an element of the cause of action," the court should "find that jurisdiction exists and deal with the objection as a direct attack on the merits of plaintiff's case." Id. (quoting Williamson v. Tucker, 645 F.2d 404, 415–16 (5th Cir. 1981)).

### C. Motions to Dismiss: Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While this pleading standard does not require "detailed factual allegations," the Supreme Court has held that "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will

not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A complaint is plausible on its face when a plaintiff pleads factual content necessary for a court to draw the reasonable inference that the defendant is liable for the conduct alleged. Id. (citing Twombly, 550 U.S. at 556).

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1296 (11th Cir. 2011) (quoting Garfield v. NDC Health Corp., 466 F.3d 1255, 1261 (11th Cir. 2006)). But this principle does not apply to legal conclusions set forth in the complaint. Iqbal, 556 U.S. at 678.

## III.  DISCUSSION

The Court first considers Plaintiffs' Motion to Amend and then turns to Defendants' Motions to Dismiss. For the reasons discussed below, the Court denies Plaintiffs' Motion to Amend and grants Defendants' Motions to Dismiss.

### A. Motion to Amend

First, Plaintiffs seek leave to file a Second Amended Complaint, based primarily on a non-binding case from this District, which relied on an unpublished Eleventh Circuit opinion. Dkt. No. [150] (discussing Gardner v.

Bottoms, 1:21-cv-02798-TCB, 2023 WL 5596400 (N.D. Ga. July 21, 2023) and

Captain Jack's Crab Shack, Inc. v. Cooke, No. 21-11112, 2022 WL 4375364 (11th

Cir. Sept. 22, 2022)). In both of those cases, the courts dismissed the plaintiffs'

claims against prosecutor defendants for failure to plead sufficient facts showing

that the prosecutors were acting outside of the judicial process, which would

eliminate absolute immunity. Consequently, Plaintiffs want to add additional

facts relating to the DA Defendants to show that they were acting in an

investigatory—rather than prosecutorial—role here. Id. at 1–7. Plaintiffs also seek

to consolidate their Complaints into a single pleading, which they claim would

benefit all parties. Id. at 9. Plaintiffs argue that amendment would not prejudice

Defendants because Defendants would be able to assert the same arguments and

defenses again in a third round of motions to dismiss. Id. at 9–10.

 Defendant Fulton County opposes Plaintiffs' Motion, arguing that

amendment would be futile because Plaintiffs have failed to state a claim against

Fulton County. Dkt. No. [154]. The City Defendants oppose Plaintiffs' Motion

because Plaintiffs do not rely on any new facts, and they argue that the Gardner

decision does not require any new pleadings. Dkt. No. [155].

 Although the federal rules state that "[t]he court should freely give leave

when justice so requires," Fed. R. Civ. P. 15(a), there are several factors for the

Court to consider in determining whether amendment is appropriate. The

Supreme Court has listed "undue delay, bad faith or dilatory motive on the part of

the movant, repeated failure to cure deficiencies by amendments previously

allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," as reasons that a court may deny a motion to amend. Foman, 371 U.S. at 182.

Plaintiffs admit that they believe the new facts they would add to their Complaints go beyond what is necessary and that they only seek to amend "out of an excess of caution" because of a new non-binding case. Dkt. No. [150] at 11. Plaintiffs even assert that the Eleventh Circuit decision that the Gardner court relied on does not alter the prosecutorial investigative act analysis. Id. at 12. Having reviewed Plaintiffs' proposed amended pleading, the Court finds that amendment would be futile. Plaintiffs only seek to add facts regarding whether the DA Defendants were acting in a prosecutorial or investigatory capacity. For the reasons explained further below, the Court finds that the DA Defendants were not acting in their prosecutorial capacity when conducting an initial investigation, procuring an arrest warrant, and making statements to the media. Nonetheless, the Court finds that Plaintiffs' claims are due to be dismissed on other grounds—both as currently pled and as proposed. Accordingly, amendment is futile. Amendment would also cause undue delay to this case and prejudice to Defendants in having to submit a third round of motions to dismiss. Therefore, Plaintiffs' Motion to Amend is **DENIED**.

### B. Motions to Dismiss

Defendants' Motions to Dismiss can be divided into three groups: (1) the District Attorney Defendants assert the same immunities from suit; (2)

Defendants Brosnan and Shields both assert qualified immunity; and (3) Defendants Fulton County and City of Atlanta assert that Plaintiffs cannot establish <u>Monell</u> liability against them. The Court considers these arguments in turn.

### 1. *District Attorney Defendants*

Together, the DA Defendants face § 1983 claims for illegal arrest, property seizure, and conspiracy in their official and individual capacities, as well as state law claims for false arrest and conspiracy. Defendant Howard also faces separate § 1983 claims for property seizure and stigma-plus defamation, as well as state law tort ratification claims. The Court begins with whether absolute or qualified immunity shields the DA Defendants from claims against them in their individual capacities and then turns to whether sovereign immunity bars claims against the DA Defendants in their official capacities.

### a. Absolute Immunity

For their individual capacity claims, the DA Defendants assert that absolute immunity shields them from suit. Prosecutors enjoy absolute immunity from § 1983 claims when they are acting in their prosecutorial capacity. <u>Imbler v. Pachtman</u>, 424 U.S. 409, 427–29 (1976); <u>Buckley v. Fitzsimmons</u>, 509 U.S. 259, 272–73 (1993). The Supreme Court has provided a functional test to determine whether a prosecutor's actions relate to their duties as an officer of the court. Actions as an officer of the court are protected by absolute immunity, while other actions receive only qualified immunity. The functional test "looks to 'the nature

of the function performed, not the identity of the actor who performed it.'"
Buckley, 509 U.S. at 269 (quoting Forrester v. White, 484 U.S. 219, 229 (1988)).

Plaintiffs admit that if the DA Defendants were acting as prosecutors, (1) absolute immunity would block their individual capacity claims, and (2) Eleventh Amendment sovereign immunity would block their official capacity claims. However, Plaintiffs contend that neither the Eleventh Amendment nor absolute immunity bars their claims because the DA Defendants were not acting in their prosecutorial roles on behalf of the State here. Plaintiffs argue that conducting a probable cause investigation and procuring warrants are traditional law enforcement duties, not part of the DA Defendants' duties as officers of the court. Plaintiffs also contend that Defendant Howard was running a "quasi-police force" by conducting this investigation.

"The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." Id. (alteration adopted) (quoting Burns v. Reed, 500 U.S 478, 486 (1991)). In Buckley v. Fitzsimmons, 509 U.S. 259 (1993), the Supreme Court explained the contours of absolute immunity for prosecutors: "A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." Id. at 273; see also Burns, 500 U.S. at 494–96. Absolute immunity only covers "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an

advocate for the State." <u>Buckley</u>, 509 U.S. at 273. "Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury *after a decision to seek an indictment has been made*." <u>Id.</u> (emphasis added).

Here, the DA Defendants were not acting in their roles as advocates for the State when they undertook an initial investigation and secured arrest warrants. As the <u>Buckley</u> Court explained,

> There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand.

<u>Id.</u> Because other law enforcement officers are entitled only to qualified immunity, the Supreme Court has reasoned that "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'" <u>Id.</u> (quoting <u>Hampton v. Chicago,</u> 484 F.2d 602, 608 (7th Cir. 1973)).

Those considerations apply here. Plaintiffs allege that Defendant Howard started a first-instance probable cause investigation to secure arrest warrants for his own political gain. Dkt. No. [101] ¶ 63; Dkt. No. [103] ¶¶ 53, 55. Within five days, Defendant Howard instructed Defendant Hannah to obtain arrest warrants, based primarily on video footage of Plaintiffs' encounter with Brooks. Dkt. No.

[101] ¶ 66; Dkt. No. [103] ¶ 56. Defendant Hannah applied for the warrant, which was issued preindictment. Dkt. No. [101] ¶ 70; Dkt. No. [103] ¶¶ 57, 61.

As the Supreme Court has explained, "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." Buckley, 509 U.S. at 274. Therefore, when gathering evidence for probable cause and procuring a warrant without an indictment, the DA Defendants were not acting within their protected advocacy role. Rehberg v. Paulk, 611 F.3d 828, 841 (11th Cir. 2010) (noting that prosecutors "generally would not receive absolute immunity for fabricating evidence, because investigating and gathering evidence falls outside the prosecutor's role as an advocate"). Instead, the DA Defendants performed functions that other law enforcement officers routinely do. See Kalina v. Fletcher, 522 U.S. 118, 129–131 (1997) (holding that absolute immunity was not available to a prosecutor testifying about facts to support an arrest warrant);  Jones v. Cannon, 174 F.3d 1271, 1284–85 (11th Cir. 1999) (finding no absolute immunity for a detective's sworn affidavit at a probable cause hearing because "a police officer's submitting an affidavit seeking an arrest warrant from a state district court judge . . . was too far removed from the judicial phase of criminal proceedings to be the kind of action entitled to absolute immunity"); Malley v. Briggs, 475 U.S. 335, 343 (1986) ("In the case of the officer applying for a warrant, it is our judgment that the judicial process will on the whole benefit from a rule of qualified rather than

absolute immunity."). Accordingly, the DA Defendants are entitled only to qualified immunity—not absolute immunity.[3]

### b. Qualified Immunity

Next, the DA Defendants argue that even without absolute immunity, they are entitled to qualified immunity for Plaintiffs' § 1983 claims against them in their individual capacities. Additionally, Counts One and Two from each Plaintiff, alleging property seizure and stigma-plus defamation against Defendant Howard, are not covered by absolute immunity. Those claims derive from statements that Defendant Howard made to the media, which were indisputably outside of his advocacy role as a prosecutor. See Buckley, 509 U.S. at 277–78. Defendant Howard asserts that qualified immunity also covers those claims.

To defeat a § 1983 claim with qualified immunity, defendants must show that the officials were "acting within the scope of [their] discretionary authority at the time of the alleged misconduct." Paez v. Mulvey, 915 F.3d 1276, 1284 (11th Cir. 2019). If a defendant meets this threshold, the burden shifts to the plaintiff to show that the officials violated a clearly established constitutional right. Id.

To determine whether a defendant was acting within the scope of his discretionary authority, "[i]nstead of focusing on whether the acts in question involved the exercise of actual discretion, [the Court must] assess whether they

---

[3] Because the Court finds that qualified immunity shields the DA Defendants from suit here, it need not address the remainder of the parties' absolute immunity arguments.

are of a type that fell within the employee's job responsibilities." Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004). It is a two-fold inquiry: the Court must determine whether the defendant was "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Id. "In applying each prong of this test, [the Court] look[s] to the general nature of the defendant's action, temporarily putting aside the fact that it may have been" unconstitutional. Id. at 1266.

The DA Defendants all assert that they are entitled to qualified immunity because they were acting within their discretionary authority. Defendant Hannah asserts that preparing an arrest warrant and submitting it to a judge are part of a district attorney investigator's role. Dkt. No. [106-1] at 16. Defendant Rucker contends that determining whether to review Plaintiff Brosnan's medical records and allegedly participating in the DA Defendants' investigation were part of his role in preparing for prosecution. Dkt. No. [109] at 10–11; Dkt. No. [110] at 10. And Defendant Howard provides that seeking warrants, initiating prosecutions, and speaking to the press are part of his discretionary functions as a district attorney. Dkt. No. [125] at 14, 17; Dkt. No. [126] at 14, 17. The DA Defendants' arguments about absolute immunity also underscore their position that they were acting within their discretionary authority because the DA Defendants assert that their conduct was within their traditional prosecutorial roles.

Plaintiffs contend that the DA Defendants have failed to show that they were acting within their discretionary authority because they "stepped outside of

the normal duties of a prosecutor's office, *i.e.*, the scope of their employment"
and performed functions traditionally done by police officers. Dkt. No. [136] at
18. But the fact that police officers can perform these functions does not mean
that district attorneys and their employees cannot. In fact, the same Supreme
Court case law that Plaintiffs rely on for their absolute immunity arguments
emphasizes the breadth of prosecutors' responsibilities beyond the courtroom.
See Buckley, 509 U.S. 259 (finding that qualified immunity attaches to
prosecutors' investigative work and statements to the media); id. at 274 (stating
that a prosecutor executing a raid would be entitled to qualified immunity);
Burns, 500 U.S. 478 (holding that participation in a probable cause hearing was
subject to absolute immunity while providing legal advice to police was only
subject to qualified immunity); Kalina, 522 U.S. 118 (discussing immunity for a
prosecutor filing charging documents and testifying in support of an arrest
warrant). Similarly, the DA Defendants investigating Plaintiffs, procuring search
and arrest warrants, and speaking with the media all fall within the ambit of a
district attorney's employment. They executed job-related functions by means
within their power, so the DA Defendants have satisfied the first prong of
qualified immunity.

Because the DA Defendants were acting within the scope of their
discretionary authority, the burden shifts to Plaintiffs to show that Defendants (1)
violated Plaintiffs' constitutional rights, (2) which were clearly established at the
time of the violation. Courts may consider the "constitutional violation" and

"clearly established" elements of qualified immunity in either order. <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009). The Court finds that Plaintiffs cannot meet this burden for any of the DA Defendants.

First, the DA Defendants assert that they are entitled to qualified immunity on all individual capacity claims against them. Plaintiff Brosnan does not dispute qualified immunity for his Fourth Amendment property seizure count regarding his cell phone. Brosnan alleges that the DA Defendants improperly seized his phone pursuant to an improper search warrant. Dkt. No. [103] ¶¶ 151–57. Searching and seizing a phone pursuant to a signed warrant is within a prosecutor's discretionary authority. Without any law from Brosnan, Plaintiffs have failed to carry their burden to defeat qualified immunity on this claim. Accordingly, Plaintiff Brosnan's Count Four against the DA Defendants in their individual capacity is dismissed, and the Court turns to the DA Defendants' disputed qualified immunity arguments.

### i. Defendant Hannah

Plaintiffs allege that Defendant Hannah violated their Fourth Amendment rights by recklessly disregarding facts that vitiated probable cause to secure arrest warrants. Dkt. No. [136] at 20–21. For support, Plaintiffs cite two Eleventh Circuit cases: <u>Paez v. Mulvey</u>, 915 F.3d 1276 (11th Cir. 2019), and <u>Jones v. Cannon</u>, 174 F.3d 1271 (11th Cir. 1999). <u>Id.</u> Plaintiffs do not include any analysis of these cases or explain how they demonstrate a clearly established constitutional violation. Nor do Plaintiffs provide the arrest warrant affidavits'

contents for the Court to evaluate what facts they contained. The Court finds that Plaintiffs have not met their burden to show that Defendant Hannah violated their Fourth Amendment rights.

A malicious prosecution claim requires proof that there was no probable cause to support an arrest warrant. <u>Luke v. Gulley</u>, 50 F.4th 90, 95–96 (11th Cir. 2022) (per curiam). The Eleventh Circuit has explained, "[A]n arrest warrant is constitutionally infirm when either 'the officer who applied for the warrant should have known that his application failed to establish probable cause or that an official . . . intentionally or recklessly made misstatements or omissions necessary to support the warrant.'" <u>Id.</u> (quoting <u>Williams v. Aguirre</u>, 965 F.3d 1147, 1165 (11th Cir. 2020)). "[W]arrantless arrests concern whether the facts known to the arresting officer establish probable cause, while seizures pursuant to legal process concern whether the judicial officer who approved the seizure had sufficient information to find probable cause." <u>Williams</u>, 965 F.3d at 1162–63. Put simply, an officer seeking an arrest warrant must present information sufficient for the judge to find probable cause. <u>Id.</u> at 1162.

"Probable cause exists when 'the facts and circumstances within the officers' knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" <u>See</u> <u>Jordan v. Mosley</u>, 487 F.3d 1350, 1355 (11th Cir. 2007) (quoting <u>Miller v. Harget</u>, 458 F.3d 1251, 1259 (11th Cir. 2006)). In the qualified immunity context, an

officer only needs arguable probable cause. See Butler v. Smith, 85 F.4th 1102, 1108 (11th Cir. 2023). Arguable probable cause exists where a reasonable officer in the same circumstances, with the same knowledge as the defendant, could have believed that probable cause existed. Grider v. City of Auburn, 618 F.3d 1240, 1257 (11th Cir. 2010). "Whether an officer possesses arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." Id.

To show a Fourth Amendment violation in this instance, "a plaintiff must establish (1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process." Williams, 965 F.3d at 1165. In other words, the Court must determine whether the affidavit would establish arguable probable cause after deleting the misstatements and adding the allegedly material omissions. Id. As the Eleventh Circuit has explained, Plaintiffs bear the burden of establishing material inaccuracies in the affidavit:

> The plaintiff must first explain how any inaccuracies were material, *i.e.*, "necessary to support the warrant." If the affidavit still manages to establish probable cause for the crime charged even after correcting the defendant's purported lies, misleading statements, and omissions, then that misconduct did not cause the plaintiff any harm.

Sylvester v. Fulton Cnty. Jail, No. 22-13258, 2024 WL 1046536, *4 (11th Cir. Mar. 11, 2024) (citation omitted). Plaintiffs have not satisfied that burden here. Plaintiffs have not pled any facts about what the affidavits contained, nor have

they shown that correcting the alleged inaccuracies would defeat arguable probable cause.

Plaintiff Brosnan faced charges for aggravated assault and violation of oath by a public officer. Dkt. No. [103] ¶ 132. Brosnan claims that the DA Defendants either concealed or misrepresented the following facts:

> (1) Plaintiff was assaulted, injured, hospitalized, and had reason to believe that Brooks was extremely dangerous; (2) Brooks was extremely intoxicated on numerous substances; (3) Plaintiff did not have access to a first aid kit and called for medical assistance repeatedly; and (4) Plaintiff never "stood" on Brooks, nor did anything that would constitute Aggravated Assault under Georgia law.

Id. ¶ 134. Brosnan also states that the DA Defendants should have known that he did not have a first aid kit in his patrol car but immediately called for assistance and that Plaintiffs provided Brooks with medical attention after securing the scene. Id. ¶ 138. Last, Brosnan claims that he never stood on Brooks's upper body, but he admits that he put his foot on Brooks's arm to retrieve his TASER. Id. ¶ 139. Even taking all of these facts as true, Brosnan has not shown that Defendant Hannah lacked arguable probable cause.

Aggravated assault occurs when a person assaults another with intent to murder, rape, or rob them or "[w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury."[4] O.C.G.A. § 16-5-21. The facts that

---

[4] Aggravated assault may also occur in several other circumstances, but those circumstances do not appear relevant to Plaintiffs' conduct here. See O.C.G.A. § 16-5-21(c)–(l).

Brosnan lists do not relate to these elements. Several of these facts concern Brooks's conduct and emphasize that Brosnan was also injured, but they fail to show that Brosnan did not commit aggravated assault. Because Brosnan has not pled any facts about what the affidavits *did* contain, he has not carried his burden to show that Defendant Hannah lacked arguable probable cause for aggravated assault.

Next, violation of oath by a public officer is a criminal offense for a "public officer who willfully and intentionally violates the terms of his oath as prescribed by law." O.C.G.A. § 16-10-1. Brosnan failed to plead facts about both the contents of the affidavits and the substance of his oath of office. Without these facts, Brosnan has not met his burden to show a Fourth Amendment violation on this charge.

Additionally, Brosnan alleges that the DA Defendants knew or should have known that his conduct was justified because of Brooks's behavior at the scene, including stealing Brosnan's TASER. Brosnan also contends that the DA Defendants should have known that his conduct was authorized under Georgia law. Dkt. No. [103] ¶ 142. Such justifications act as an affirmative defense that Plaintiff could have asserted if his criminal prosecution had continued. But officers are not required to consider potential affirmative defenses when seeking arrest warrants.[5] See Jordan, 487 F.3d at 1357 ("Under the law of probable cause,

---

[5] Plaintiffs do not argue that a different standard applies to prosecutors seeking arrest warrants or provide any law stating the same. Also, the Court notes that in

no police officer had a duty to resolve this legal question before seeking out Plaintiff's arrest." (citing <u>Pickens v. Hollowell</u>, 59 F.3d 1203, 1207 (11th Cir. 1995))); <u>see also</u> <u>Morris v. Town of Lexington</u>, 748 F.3d 1316, 1325 (11th Cir. 2014). Therefore, Plaintiff Brosnan has not shown that Defendant Hannah violated his Fourth Amendment rights.

Plaintiff Rolfe faced charges for aggravated assault, first degree criminal damage to property, felony murder, and violation of oath by a public officer. Dkt. No. [101] ¶ 145. Rolfe alleges that the DA Defendants concealed or misrepresented the following facts:

> (1) Officer Brosnan and Plaintiff were assaulted, injured, hospitalized, and had reason to believe that Brooks was extremely dangerous; (2) that Brooks was extremely intoxicated on numerous substances; (3) that Plaintiff sprinted to obtain his personal first aid kit; (4) that Officer Brosnan never "stood" on Brooks, nor did anything that would constitute Aggravated Assault under Georgia law, (5) that Plaintiff never kicked Brooks, and (6) that Plaintiff and Officer Brosnan called for EMS immediately and administered first aid to Brooks, including CPR, until they were relieved by EMS.

<u>Id.</u> ¶ 147. Rolfe also claims that the DA Defendants should have known that he did not willfully fail to provide assistance. <u>Id.</u> ¶ 151. Finally, Rolfe alleges that Defendants should have known that his conduct was authorized under Georgia

---

an unpublished decision, the Eleventh Circuit acknowledged an exception to this rule when "the arresting officer actually has knowledge of facts and circumstances conclusively establishing an affirmative defense." <u>Williams v. Sirmons</u>, 307 F. App'x 354, 358 (11th Cir. 2009). Plaintiffs have not shown that Defendant Hannah had actual knowledge of facts conclusively establishing such a defense here.

law. Id. ¶ 154. These facts do not defeat arguable probable cause to arrest Rolfe for any of the four offenses charged.

First, aggravated assault includes assault "[w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury." O.C.G.A. § 16-5-21(a)(2). Like Brosnan, Rolfe has not pled any facts about arrest warrant affidavits' contents, so the Court cannot evaluate what Defendant Hannah included in his affidavit. But Rolfe admits that he fired both his TASER and his service firearm at Brooks, Dkt. No. [101] ¶¶ 37, 39, creating arguable probable cause for aggravated assault.

Second, criminal damage to property in the first degree occurs when a person "[k]nowingly and without authority interferes with any property in a manner so as to endanger human life." O.C.G.A. § 16-7-22(b)(1). None of the facts that Rolfe claims Defendant Hannah concealed or misrepresented relates to interference with property, so Rolfe has not shown that Defendant Hannah lacked arguable probable cause on this charge.

Third, as discussed above, a "public officer who willfully and intentionally violates the terms of his oath as prescribed by law," commits the offense of violation of oath by a public officer. O.C.G.A. § 16-10-1. Rolfe does not plead any facts about the terms of his oath, nor does he explain how any alleged inaccuracies in the affidavits relate to those terms. Without those facts, Rolfe has not pled a Fourth Amendment violation for his arrest on this charge.

24

Fourth, the Georgia felony murder statute reads, "A person commits the offense of murder when, in the commission of a felony, he or she causes the death of another human being irrespective of malice." O.C.G.A. § 16-5-1(c). None of the alleged misstatements or omissions changes the fact that Rolfe fatally shot Brooks. Rolfe does not argue that he did not cause Brooks's death; the closest fact that Rolfe points to is that he did not kick Brooks. Thus, with probable cause to support the three felonies just discussed, Defendant Hannah also had arguable probable cause to arrest Rolfe for felony murder.

While some of the facts that Rolfe alleges were concealed or misrepresented may serve to justify Rolfe's actions at the scene, officers are not required to consider affirmative defenses when procuring a warrant. Jordan, 487 F.3d at 1357. The undisputed fact that Plaintiff fatally shot Brooks remains. Therefore, Plaintiff Rolfe has not carried his burden to show that Defendant Hannah violated his Fourth Amendment rights.

In sum, Plaintiffs have not pled sufficient facts to show malicious prosecution. In the qualified immunity context, Plaintiffs bear the burden of showing a clearly established constitutional violation. Plaintiffs do not include any facts about what Defendant Hannah *did* include in his warrant and instead only list facts that they claim he misrepresented or omitted. Thus, even taking all of Plaintiffs' factual allegations as true, they have not carried their burden to show that Defendant Hannah lacked arguable probable cause to arrest them. Because Plaintiffs have not shown a constitutional violation, they cannot defeat

qualified immunity on their claims against Defendant Hannah. Accordingly, the Court need not analyze the clearly established law prong, and Plaintiffs' unconstitutional seizure claims relating to their arrests are due to be dismissed.

### ii. Defendant Rucker

Next, Plaintiffs allege that Defendants "Howard, Hannah, and Rucker were working in concert to closely coordinate their actions for Howard's benefit" when securing arrest warrants for Plaintiffs. Dkt. No. [101] ¶ 70. Plaintiffs claim that Rucker was involved in obtaining these warrants, but Plaintiffs do not include specific facts relating to Defendant Rucker's conduct beyond meeting with Plaintiff Brosnan once. Dkt. No. [103] ¶ 52. Even accepting Plaintiffs' allegations that Defendant Rucker secured arrest warrants for them, Rucker is entitled to qualified immunity. For the same reasons discussed regarding Defendant Hannah, Plaintiffs have failed to show that Defendant Rucker violated their constitutional rights. Because correcting the alleged material omissions and misstatements in the arrest warrant affidavits would not vitiate probable cause, there is no Fourth Amendment violation.

In their Response to Defendant Rucker's Motion to Dismiss, Plaintiffs also contend that the DA Defendants significantly interfered with their property and that whether third parties effected that seizure is not dispositive. Dkt. No. [135] at 26. Plaintiffs do not include any facts to support that contention, and Defendant Rucker is not named as a Defendant in Counts One or Two, both of which involve property seizure. Count Three, Plaintiffs' Fourth Amendment claim against

Defendant Rucker, alleges malicious prosecution, not property seizure. And Plaintiff Brosnan's Count Four alleging property seizure is dismissed for the reasons discussed above. Thus, Defendant Rucker is also entitled to qualified immunity for the individual capacity § 1983 claims against him.

### iii. Defendant Howard

Next, Defendant Howard is also entitled to qualified immunity. For the same reasons discussed regarding Defendant Hannah, Plaintiffs have failed to show that Defendant Howard violated their Fourth Amendment rights through his involvement in obtaining the arrest warrants. Because the Court finds that Defendant Hannah had probable cause, Defendant Howard is not at fault for directing Hannah's conduct.

Turning to the claims asserted against Defendant Howard apart from the other two DA Defendants, the Court finds that Plaintiffs have not shown clearly established constitutional violations for property seizure in Count One or stigma-plus defamation in Count Two.

In Count One, Plaintiffs allege that Defendants Howard and Bottoms interfered with their constitutionally protected property rights by making inflammatory statements in the media, which caused Plaintiffs to leave their homes in fear of violence by third parties protesting. Plaintiffs claim that Defendants Howard and Bottoms "encouraged and incited" rioters who put Plaintiffs' lives in danger. Dkt. No. [103] ¶ 81. As a result, Plaintiffs left their homes and claim that Defendants Howard and Bottoms interfered with their

possessory interests in their personal property and apartments. Id. ¶ 70. This is not sufficient to show a Fourth Amendment violation for unconstitutional property seizure.

To defeat qualified immunity for this count, Plaintiffs must show that Defendant Howard violated their clearly established constitutional right. Plaintiffs synthesize the following rule from Supreme Court case law: a property seizure occurs when a state agent meaningfully interferes with a private citizen's possessory interest in property; such seizure can occur with physical force, a show of authority, or a mere touch restraining a person's liberty. Dkt. No. [138] at 28. Plaintiffs emphasize that there is no requirement that the government take control of the property; only interference with the owner's interest is necessary. Id.

Still, there must be a causal link between the official's action and the deprivation of a constitutional right. "To impose liability under Section 1983, the government entity's actions must be the 'moving force' behind the deprivation of a constitutional right." Chabad Chayil, Inc. v. Sch. Bd. of Mia.-Dade Cnty., 48 F.4th 1222, 1235 (11th Cir. 2022). "A defendant's actions cannot be the moving force behind a violation where the actions of another, independent decisionmaker break[] the chain of causation." Id. at 1235–36. On Plaintiffs' property deprivation theory, there were two independent decisionmakers: the third parties that Plaintiffs believed threatened their safety and Plaintiffs who decided to vacate. Plaintiffs argue that Defendant Howard's actions could be seen

as encouragement for third parties to violate the Fourth Amendment and that they "literally may have been murdered by a mob of people had [they] not fled." Dkt. No. [138] at 32. Yet, Plaintiffs acknowledge that there was "widely[]available video evidence" of their encounter with Brooks, cutting against Plaintiffs' theory that Defendant Howard's statements themselves incited protests against Plaintiffs' conduct. Dkt. No. [101] ¶ 91. The Court also disagrees that violence against Plaintiffs would be the "natural and probable consequence" of Defendant Howard's statements. Dkt. No. [138] at 32. Additionally, violence seven miles from Plaintiff Brosnan's home and "a short drive" from Plaintiff Rolfe's home is not sufficient to show a meaningful interference with their property interests. Dkt. No. [101] ¶ 90; Dkt. No. [103] ¶ 74. Plaintiffs make no showing that the protestors or Defendants ever damaged or threatened Plaintiffs' homes. Thus, Defendant Howard's statements are too far attenuated from any interference with Plaintiffs' property rights to show a constitutional violation.

Additionally, Plaintiffs do not cite any case law with similar facts sufficient to put Defendant Howard on notice that his conduct could violate the Fourth Amendment. There are three ways that an official may be considered on notice by virtue of clearly established law: (1) a materially similar case in binding precedent, (2) "a broader, clearly established principle" that should control the situation, or (3) conduct "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent." Ingram v Kubik, 30 F.4th 1241, 1252 (11th Cir. 2022) (quoting Patel v.

City of Madison, 959 F.3d 1330, 1343 (11th Cir. 2020)). Such precedent must come from the U.S. Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court and must place "the statutory or constitutional question beyond debate." Bradley v. Benton, 10 F.4th 1232, 1242–43 (11th Cir. 2021) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). Plaintiffs appear to rely on the first route, but they cite several non-binding cases from district courts and other circuits.

The binding cases that Plaintiffs cite do not have materially similar facts, nor do they demonstrate a well-established Fourth Amendment principle about inflammatory statements by government actors causing someone to leave their home—much less individuals leaving their homes because of potential threats by non-governmental third parties allegedly incited by those government actors. For example, in Soldal v. Cook County, 506 U.S. 56 (1992), a mobile home was badly damaged during an eviction. In Payton v. New York, 445 U.S. 573 (1980), officers attempted to make a warrantless arrest in a murder suspect's home. And in United States v. Jacobsen, 466 U.S. 109 (1984), officers inspected a package of cocaine sent through a private carrier. Here, Plaintiffs allege that Defendants Howard and Bottoms incited violence in Atlanta that caused Plaintiffs to fear for their lives and leave their homes, interfering with their property interests. None of these cases is sufficiently similar to create clearly established law that would put Defendants on notice that their conduct may violate the Fourth Amendment.

Plaintiffs then seek to argue from the absence of case law: Plaintiffs claim there are no cases requiring that a government defendant's actions be aimed

directly at a plaintiff's property. Dkt. No. [138] at 29. The lack of a rule cannot show clearly established law. Plaintiffs also argue that the Court should apply a novel theory to their claims, using a test for § 1983 claims against a private party. Id. at 31. Because qualified immunity protects officers from suit when their conduct did not violate clearly established law, Plaintiffs cannot rely on a new theory to defeat qualified immunity. Plaintiffs' Count One against Defendant Howard must be dismissed.

Finally, Plaintiffs' last § 1983 claim against Defendant Howard alleges stigma-plus defamation and due process violations. "The 'stigma-plus' test requires not only allegations stating a common-law defamation claim, but also an additional constitutional injury, tied to a previously recognized constitutional property or liberty interest, flowing from the defamation." Rehberg, 611 F.3d at 852. In other words, defamation is only actionable under § 1983 if a plaintiff can show that an official defamed them, resulting in both reputational harm (stigma) and interference with a constitutionally protected right (plus). See Paul v. Davis, 424 U.S. 693, 712 (1976) ("[P]etitioners' defamatory publications, however seriously they may have harmed respondent's reputation, did not deprive him of any 'liberty' or 'property' interests protected by the Due Process Clause."). Here, Plaintiffs assert that they lost (1) their homes and possessions when they left their

apartments and (2) their personal liberty when they were arrested.[6] Dkt. No. [138] at 21.

Plaintiffs allege that Fourth Amendment violations can be used as a "plus" and that having a home is a quintessential liberty interest. As the Court has already explained, Plaintiffs have not shown a Fourth Amendment seizure of their homes, and Plaintiffs' arrests were constitutional. Nonetheless, Plaintiffs seem to focus their stigma-plus argument on whether Defendants' conduct was a constitutional violation, and Plaintiffs fail to provide any case law to satisfy the clearly established law prong. Instead, Plaintiffs point to stigma-plus cases with different facts—none of which show a government official making defamatory statements that cause an arrest or cause someone to leave their home because of perceived threats from non-governmental third parties.[7] See, e.g., Meyer v. Nebraska, 262 U.S. 390 (1923) (concerning legislation banning the teaching of foreign languages in schools); Bridges v. Wixon, 326 U.S. 135 (1945) (concerning deportation proceedings for someone alleged to be associated with the Communist Party); United States v. James Daniel Good Real Prop., 510 U.S. 43

---

[6] Stigma-plus claims often relate to termination from government employment. Even though Plaintiff Rolfe was temporarily terminated, he does not allege that his termination is the "plus" factor for this claim. Dkt. No. [138] at 21.

[7] Plaintiffs cite these cases for the premise that they have a constitutionally protected interest in their homes. Dkt. No. [138] at 22–23. Even accepting a constitutional right to one's own home, the Court need not determine the scope of that right because Plaintiffs have not shown that Defendants or third parties meaningfully interfered with their homes.

(1993) (concerning civil forfeiture of a criminal defendant's home). Without such a showing, Plaintiffs have not carried their burden to defeat qualified immunity on this count.

Plaintiffs also rely on Marrero v. City of Hialeah, 625 F.2d 499 (5th Cir. 1980) for the premise that Fourth Amendment violations can be used for stigma-plus claims and that direct causation is not required; only "perceived connection" between the defamation and constitutional interest is necessary. Dkt. No. [138] at 21–22. This case is unlike Marrero because the court there determined that the plaintiff's arrest was illegal; here, the Court has determined that Defendants had probable cause to arrest Plaintiffs. See Von Stein v. Brescher, 904 F.2d 572, 583 (11th Cir. 1990) ("While the defamatory statement in Marrero was made in connection with an illegal seizure, and therefore was clearly actionable under Paul, we have decided in this case that the Defendants in the instant case did not act unreasonably in arresting Plaintiff . . . ."); Marrero, 625 F.2d at 519 ("[T]he defamation did not cause the *unlawful* arrests and search and seizure." (emphasis added)).

Although the Marrero court determined that "it is sufficient that the defamation occur in connection with, and be reasonably related to, the alteration of the right or interest," Plaintiffs choosing to leave their homes because of perceived threats from third parties does not meet that standard. Marrero, 625 F.2d at 519. Plaintiffs do not point to any statements from Defendants Howard or Bottoms encouraging third parties to use violence or harm Plaintiffs.

Additionally, the Eleventh Circuit has applied the "moving force" causation test in stigma-plus decisions after <u>Marrero</u>. <u>See e.g.</u>, <u>Chabad</u>, 48 F.4th at 1235–36. As already explained, Plaintiffs cannot show that Defendant Howard's statements were the moving force behind their arrest (which was justified by probable cause, as determined by a state court judge) or their decision to leave their homes (which was spurred by fear of threats from non-governmental third parties). Thus, the Court finds that Plaintiffs have failed to show the constitutional violations necessary for a viable stigma-plus claim and need not address whether Plaintiffs have sufficiently pled defamation under state law or the need for a post-deprivation name-clearing hearing.

Therefore, Plaintiffs' claims against the DA Defendants in their individual capacities are **DISMISSED**.

### c. Sovereign Immunity

Next, the District Attorney Defendants assert that this Court lacks jurisdiction over Plaintiffs' official capacity claims against them because of Eleventh Amendment sovereign immunity. "Absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court." <u>Kentucky v. Graham</u>, 473 U.S. 159, 169 (1985). The Eleventh Amendment bars official capacity claims because "a judgment against a public servant in his official capacity imposes liability on the entity that he represents." <u>Id.</u> (cleaned up). All parties agree that neither Georgia nor Congress has waived immunity here.

Instead, the parties dispute whether the DA Defendants were acting on behalf of the state or the county. The DA Defendants contend that Georgia district attorneys are state officers. Plaintiffs assert that the DA Defendants were not acting in their traditional prosecutorial roles when they investigated Plaintiffs and obtained arrest warrants for them, so they were not acting on behalf of the state. Plaintiffs assert that they were acting on Fulton County's behalf at all times relevant to their claims.

Plaintiffs conflate the prosecutorial immunity analysis with the state actor analysis. Plaintiffs argue that because the DA Defendants stepped outside of their advocacy roles, they could not have been acting for the state. But the proper Eleventh Amendment inquiry is whether the DA Defendants were acting for the county or the state—not whether their conduct was part of judicial proceedings. Here, although the Court determined that the DA Defendants were not acting within their prosecutorial capacity as defined by the Supreme Court for purposes of absolute immunity, the DA Defendants were still acting well within their job duties by investigating Plaintiffs, procuring arrest warrants, and making public statements about the arrests. No one contends that the DA Defendants were not authorized to conduct a first-instance investigation or to obtain warrants. Plaintiffs argue that the DA Defendants usurped traditional law enforcement roles and that Defendant Howard created a "quasi-police force," but Plaintiffs do not argue that the warrants were improper solely because the DA Defendants obtained them. The fact that the DA Defendants are not entitled to absolute

immunity does not mean that were not acting on behalf of the State for Eleventh Amendment purposes.

The Eleventh Amendment analysis is different. Whether an officer is an "'arm of the State' must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003). The Eleventh Circuit uses four factors for this analysis: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." Id. at 1309. Plaintiffs acknowledge that the DA Defendants could be state officials, but they contend that the DA Defendants were Fulton County actors. The Court disagrees based on the Manders factors.

First, Plaintiffs allege that the DA Defendants are Fulton County employees, not state employees.[8] Dkt. No. [136] at 24. But under Georgia law, the district attorney is a state official. Ga. Const. art. VI, § 8. In Owens v. Fulton County, 877 F.2d 947, 952 (11th Cir. 1989) (per curiam), the Eleventh Circuit

---

[8] Plaintiffs rely heavily on Grech v. Clayton County, 335 F.3d 1326 (11th Cir. 2003), but Grech supports a finding of state authority for district attorneys. In Grech, the Eleventh Circuit stated, "[T]he sheriff occupies a separate constitutional office independent from the defendant Clayton County. To the extent control over the sheriff exists, only the State has such authority and control. The sheriff receives his law enforcement power directly from the State." 335 F.3d at 1332. Georgia district attorneys also receive their power directly from the state and have constitutional authority in their judicial circuits, often encompassing multiple counties.

concluded, "the matter in dispute here is the district attorney's authority over prosecutorial decisions, which is vested by state law pursuant to state authority." The Georgia Constitution provides a district attorney for each judicial circuit—not for each individual county—and authorizes them to represent the state in criminal matters throughout that circuit. Ga. Const. art. VI, § 8, ¶ 1. Plaintiffs emphasize that labels alone are not determinative, but they are a significant factor here, especially because state law provides the scope of a district attorney's responsibilities. Plaintiffs also allege that all conduct was local to Fulton County, but that fact is not relevant to this analysis. See Peppers v. Cobb Cnty., 835 F.3d 1289, 1299 (11th Cir. 2016) ("That the Cobb Judicial Circuit's boundaries are coincidentally coterminous with Cobb County does not in any way lessen the fact that the District Attorney's Office is a state, not a county, office.").

Second, by virtue of their state-vested authority, the state retains significant control over Georgia district attorneys. As the Eleventh Circuit has explained, "[t]he Georgia district attorney's relationship to the county involves merely budgetary and administrative matters." Owens, 877 F.2d at 952. The DA Defendants' conduct here involved the "exercise of discretion in the prosecution of state offenses." Id. Even though the relevant conduct was pre-indictment—and thus outside the scope of absolute immunity—district attorneys still have discretion to investigate potential criminal behavior and to obtain arrest warrants.

Plaintiffs discuss Georgia statutory law regarding hiring for district attorneys' offices (either through state contracts or through a municipality) at length. Dkt. No. [136] at 26–30. Plaintiffs accuse Defendants of relying on state employment labels and failing to perform a functional analysis, but Plaintiffs' focus on the source of the DA employees' contracts is no more determinative of whether the DA Defendants were acting as state officers. The Court need not parse the terms of the Georgia statutes that Plaintiffs provide, nor determine whether the Defendants Hannah and Rucker were hired through state contracts or not. Because they were *functionally* state officers when investigating and initiating a prosecution in this case, duties well within their responsibility to represent the state in criminal matters, they were state officials at the time. See Owens, 877 F.2d at 952 ("The alleged violation of [the plaintiff's] constitutional rights, however, arises out of the district attorney's exercise of discretion in the prosecution of state offenses, a state-created power.").

Third, "Georgia's district attorneys are paid by state funds, although the county or counties within the district attorney's judicial circuit may supplement their salaries." Id. at 951; Ga. Const. art. VI, § 8, ¶ 1(c) ("The district attorneys shall receive such compensation and allowances as provided by law and shall be entitled to receive such local supplements to their compensation and allowances as may be provided by law."). The Eleventh Circuit has found that "the fact that [a Georgia district attorney] is paid by the state indicates that he acts on the state's behalf." Owens, 877 F.2d at 951. Plaintiffs claim that Defendant Howard used

Fulton County funds to train and supervise county employees, based on authority delegated to him by Fulton County.[9] Dkt. No. [138] at 15–17. Yet Plaintiffs "readily accept that Howard is a state actor when acting as a prosecutor." Id. at 15. Training and supervision are part of a prosecutor's duties. Cf. Van de Kamp v. Goldstein, 555 U.S. 335 (2009) (finding that absolute immunity shields prosecutors from suit for certain legal training and supervision responsibilities). Prosecutors have significant responsibilities beyond in-court advocacy, and many of those responsibilities are still within prosecutors' state authority. The DA Defendants' conduct resting outside the scope of absolute immunity does not divorce it from the DA Defendants' prosecutorial authority on behalf of the state.

Fourth, Plaintiffs assert that whether the state will pay for the judgment is a significant factor. In Manders, the Eleventh Circuit explained that a state treasury drain is not required per se and that "current Eleventh Amendment jurisprudence emphasizes the integrity retained by each State in our federal system." Manders, 338 F.3d at 1325 (quoting Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 39 (1994)). Here, because the DA Defendants are state officials, the state would face liability. Plaintiffs argue that the Court should focus on Fulton County, but Defendants have carried their burden to show that they are state officials as a matter of law.

---

[9] Plaintiffs also argue that Fulton County *could* offer funding and delegate authority to the DA Defendants for other purposes. Dkt. No. [135] at 28; Dkt. No. [138] at 16. But Plaintiffs do not provide facts sufficient to show that Fulton County actually asserted control over the DA Defendants here.

The Eleventh Amendment seeks to "accord the States the respect owed them" and to avoid affronts to States' integrity "by requiring a state to respond to lawsuits in federal courts." Id. at 1327 (alteration adopted) (quoting Hess, 513 U.S. at 39–40). Georgia district attorneys are state actors, so the Eleventh Amendment shields Georgia from defending Plaintiffs' claims. Thus, Plaintiffs' claims against the DA Defendants in their official capacities are **DISMISSED** for lack of jurisdiction.

Additionally, the Georgia Tort Claims Act ("GTCA") provides a limited waiver of sovereign immunity for torts against state officers and employees. O.C.G.A. § 50-21-23; see also Ga. Const. art. VI, § 8, ¶ 1(e) ("District attorneys shall enjoy immunity from private suit for actions arising from the performance of their duties."). Because the Court finds that the DA Defendants were acting as state officials, the GTCA applies to the state law claims against the DA Defendants. The GTCA has specific procedural requirements for suit, including *ante litem* notice. O.C.G.A. § 51-21-26. Plaintiffs admit that they have not satisfied GTCA requirements for suing the DA Defendants. Dkt. No. [135] at 1 n.1. Therefore, Plaintiffs' Georgia state law claims against the DA Defendants are **DISMISSED**.

### 2. *City Defendants*

With all claims against the DA Defendants dismissed, the Court next considers Plaintiffs' claims against the remaining individual Defendants: Defendant Bottoms and Defendant Shields. Plaintiff Rolfe alleges

(1) unconstitutional property seizure, (2) stigma-plus defamation, (3) federal and state equal protection violations, (4) tort ratification, and (5) federal and state conspiracy claims against Defendant Bottoms; Plaintiff Brosnan brings the same property seizure, stigma-plus defamation, and conspiracy claims against her. Plaintiff Rolfe also alleges federal and state equal protection violations against Defendant Shields; Plaintiff Brosnan does not have any claims against Defendant Shields.

First, the City Defendants assert that Plaintiffs' state law claims against them must be dismissed because Plaintiffs failed to provide *ante litem* notice, which is a condition precedent to bringing suit. Dkt. No. [115-1] at 22–23; O.C.G.A. § 36-33-5. Plaintiffs do not dispute this point. Thus, Plaintiffs' state law claims against the City Defendants are **DISMISSED**. The Court turns to the federal claims against Defendants Bottoms and Shields before addressing Monell liability for Defendants City of Atlanta and Fulton County.

### a. Defendant Bottoms

Defendant Bottoms asserts qualified immunity for the § 1983 claims against her in her individual capacity. The same qualified immunity framework used for the DA Defendants applies here: Defendant Bottoms must first show that she was acting within her discretionary authority. If she does, Plaintiffs bear the burden to show that Defendant Bottoms violated their clearly established constitutional rights.

First, Bottoms was acting within her discretionary authority when addressing the media about Plaintiffs' encounter with Brooks. Dkt. No. [115-1] at 4. Plaintiffs argue that Defendant Bottoms failed to carry her burden on this point by simply citing Atlanta ordinances that give the mayor's office communications responsibilities. Dkt. No. [134] at 6–10. But as Bottoms notes, she was asked to comment on this matter specifically because of her role as Mayor of Atlanta and was permitted to do so in that role. Dkt. No. [115-1] at 4. Thus, speaking on matters of public importance was a legitimate job-related function, performed through means within Mayor Bottoms's power to utilize. See Spencer v. Benison, 5 F.4th 1222, 1230–31 (11th Cir. 2021). The same is true for any involvement that Defendant Bottoms had in terminating Plaintiff Rolfe. Defendant Bottoms provides that the APD is under the mayor's supervision. Dkt. No. [116-1] at 5. Thus, Defendant Bottoms was acting within her discretionary authority, and the burden shifts to Plaintiffs to show that her conduct violated clearly established law.

### i. Stigma-Plus & Property Seizure

Plaintiffs contend that Defendant Bottoms violated their clearly established constitutional rights because her alleged defamatory and inflammatory statements interfered with their constitutional right to a home and to personal liberty. For the same reasons described above regarding Defendant Howard, Plaintiffs cannot show that Defendant Bottoms violated their clearly established constitutional rights.

Plaintiffs argue that Defendant Bottoms is not entitled to qualified immunity on their property seizure claims. Plaintiffs discuss several cases to show that a private-party seizure in connection with government action can violate the Fourth Amendment, but again, there was no unconstitutional seizure here. The same analysis used for Defendant Howard applies to Defendant Bottoms. Protestors did not seize Plaintiffs' homes at Defendant Bottoms's urging; Plaintiffs left their homes because they feared violence by third parties. Plaintiffs claim that Defendant Bottoms's statements encouraged a violent mob by confirming that Plaintiffs were culpable, giving "an imprimatur of legitimacy" to protestors' outrage. Dkt. No. [134] at 17. The Court disagrees. Defendant Bottoms's statements were not a moving force behind a purported property seizure when Plaintiffs left for fear of non-governmental third-party actors.[10]

Next, Plaintiffs' stigma-plus claim against Defendant Bottoms also fails. Plaintiffs have failed to show that Defendant Bottoms encouraged or incited violent third parties to threaten or harm Plaintiffs, requiring Plaintiffs to flee their homes. Plaintiffs also argue that Defendant Bottoms's statements were connected to their arrests. This argument fails for two reasons: (1) Plaintiffs do not allege that Defendant Bottoms played any role in procuring Plaintiffs' arrest

---

[10] Plaintiffs also urge the Court to adopt a novel theory of liability for this claim based on a non-binding case about whether a private party was acting under color of law. Dkt. No. [134] at 15–16. Plaintiffs cannot rely on novel theories of liability to defeat qualified immunity.

warrants or arresting Plaintiffs or that her statements influenced the DA Defendants; and (2) as discussed above, there was no unconstitutional arrest.

Still, Plaintiffs argue that because they lost their homes, possessions, and personal liberty close in time to Defendant Bottoms's public statements, people would perceive a connection between the violations of their rights and Defendant Bottoms's statements. Plaintiffs rely on <u>Marrero</u> for the proposition that strict causation between defamation and a constitutional violation is not necessary for a stigma-plus claim. <u>Id.</u> at 13. But again, there was no constitutional violation. Like Defendant Howard's statements, Defendant Bottoms's statements did not incite violence against Plaintiffs or meaningfully interfere with Plaintiffs' Fourth Amendment rights. Bottoms's statements in Plaintiffs' pleadings do not call for violence or contain threats against Plaintiffs. The case law that Plaintiffs cite in their Response to the City Defendants Motions to Dismiss does not demand a different result. <u>Id.</u> at 12–18. Those cases relate to a constitutionally protected interest in one's home, but they do not show that a government actor's defamatory statements may cause a property seizure through independent third-party threats leading an individual to leave his home. Without a constitutional violation, Plaintiffs cannot sustain their stigma-plus claim against Defendant Bottoms, and the Court need not address whether Defendant Bottoms's statements were defamatory or discuss the parties' arguments about a name-clearing hearing.

Plaintiffs have not shown a clearly established Fourth Amendment violation. Therefore, Plaintiffs cannot sustain their stigma-plus and property seizure claims against Defendant Bottoms.

### ii. Equal Protection

Next, Plaintiff Rolfe alleges that Defendants Bottoms and Shields violated the Equal Protection Clause. The City Defendants move to dismiss Plaintiff Rolfe's equal protection claim because there is no case law showing that an individual personnel decision violates the Equal Protection Clause. Dkt. No. [116-1] at 18–19. Plaintiff Rolfe responds that he does not seek to bring a "class of one" equal protection claim; instead, he alleges "multimember-class-based" discrimination. Dkt. No. [134] at 5. Rolfe admits that class-of-one theories fail in the government employment context but maintains that he has pled class-based discrimination. Id.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). In Plaintiff Rolfe's Complaint, he alleges that he "was a member of a group against whom there existed popular ongoing public protests" and "a member of a then-publicly-excoriated and politically reviled group." Dkt. No. [101] ¶ 209. Rolfe claims that because of this unpopularity, he was treated differently from other employees who were accused of using excessive force but

received due process in their termination processes. Id. ¶ 210. Because Plaintiff does not allege that he is part of a protected class, rational basis review applies to this claim.[11]

Under rational basis review, "States are presumed to act lawfully, and therefore state action is generally upheld if it is rationally related to a legitimate governmental purpose." Glenn v. Brumby, 663 F.3d 1312, 1315 (11th Cir. 2011). Rolfe has failed to show that Defendants lacked a rational basis for his termination. It is reasonable to assume that Rolfe was terminated because of legitimate concerns regarding his conduct with Brooks and that termination served the department's interests. Further, Rolfe does not provide any facts to show that his purported membership in an unpopular group caused his termination, nor does he provide any case law to support his position. Dkt. No. [134] at 5; see Glenn, 663 F.3d at 1321 (applying intermediate scrutiny to a sex-based discrimination claim); Engquist v. Or. Dep't of Agric., 553 U.S. 591, 605 (2008) (holding that the class-of-one equal protection theory does not apply in the public employment context). Therefore, Plaintiff Rolfe has failed to show that Defendant Bottoms violated his clearly established constitutional rights under the Equal Protection Clause. Plaintiffs' claims against Defendant Bottoms in her individual capacity are **DISMISSED**.

---

[11] Plaintiff seems to acknowledge that rational basis is the proper standard in his Complaint. Dkt. No. [101] ¶ 211 ("Shields and Bottoms had no rational basis for discipline or termination.").

### b. Defendant Shields

Defendant Shields also asserts qualified immunity for the individual capacity § 1983 claims against her. Plaintiffs concede that Defendant Shields was acting withing her discretionary authority. Dkt. No. [134] at 7. Thus, the burden shifts to Plaintiff Rolfe to show that Defendant Shields violated his clearly established constitutional rights. For the same reasons just stated regarding Defendant Bottoms, Rolfe has failed to show that Defendant Shields violated his constitutional rights under the Equal Protection Clause. Additionally, the Court notes that Plaintiffs do not make any arguments specifically relating to Defendant Shields in their Response to the City Defendants' Motion to Dismiss. Thus, Plaintiff Rolfe's claims against Defendant Shields in her individual capacity are **DISMISSED**.

Without any constitutional violations by the individual City Defendants, the official capacity claims against Defendants Bottoms and Shields must also be **DISMISSED**. Holland v. City of Atmore, 168 F. Supp. 2d 1303, 1310 n.4 (S.D. Ala. 2001) ("The absence of a constitutional violation is equally fatal to an official capacity suit and to an individual capacity suit.").

Plaintiffs' derivative claims—conspiracy and punitive damages—also must fall without any substantive claims against the individual Defendants. Without an underlying constitutional violation, there can be no conspiracy to commit such a violation. See NAACP v. Hunt, 891 F.2d 1555, 1563 (11th Cir. 1990) ("The conspiratorial acts must impinge upon the federal right; the plaintiff must prove

an actionable wrong to support the conspiracy."); Grider, 618 F.3d at 1260 ("A plaintiff may state a § 1983 claim for conspiracy to violate constitutional rights by showing a conspiracy existed that resulted in the actual denial of some underlying constitutional right."). And Plaintiffs' punitive damages claims cannot stand alone with all substantive claims dismissed. Thus, Plaintiffs' conspiracy and punitive damages claims are **DISMISSED**.

### 3. *Defendants Fulton County & City of Atlanta*

Finally, Defendants Fulton County and City of Atlanta both assert that Plaintiffs failed to allege sufficient facts to make out a Monell claim against them. Plaintiffs bring negligent training and supervision claims against Defendant Fulton County based primarily on Defendant Howard's conduct and against Defendant City of Atlanta based primarily on Defendant Bottoms's conduct. "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). Because Plaintiffs have not shown that their constitutional rights were violated, they cannot sustain a Monell claim against Defendants Fulton County and City of Atlanta.[12] Thus, Plaintiffs' Monell claims against Defendants City of Atlanta and Fulton County are **DISMISSED**.

---

[12] Even if Plaintiffs had shown a constitutional violation, they have not shown that Defendants Fulton County and City of Atlanta were deliberately indifferent

In sum, Plaintiff Rolfe's Counts One, Two, Three, Eight, and Nine are dismissed on qualified and sovereign immunity grounds. Counts Four, Five, Seven, Ten, and Twelve are dismissed as improper state law claims. Counts Six and Eleven are dismissed for failure to satisfy the elements required for Monell liability. Count Thirteen is dismissed without any substantive claims to support damages. Plaintiff Brosnan's Counts One, Two, Three, Four, and Eight are dismissed on qualified and sovereign immunity grounds. Counts Five, Nine, and Ten are dismissed as improper state law claims. Counts Six and Seven are dismissed for failure to show Monell liability, and Count Eleven is dismissed because no substantive claims remain.

## IV. CONCLUSION

In accordance with the foregoing, Plaintiff's Motion for Leave to File a Second Amended Complaint [150] is **DENIED**. Defendants' Motions to Dismiss [106, 108, 109, 110, 113, 115, 116, 125, 126] are **GRANTED**. The Clerk is **DIRECTED** to close this case.

**IT IS SO ORDERED** this 25th day of March, 2024.

**Leigh Martin May**
**United States District Judge**

---

to their constitutional rights—a high bar, especially in failure to train claims. See Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1293 (11th Cir. 2009); Gold v. City of Miami, 151 F.3d 1346, 1352 (11th Cir. 1998).